**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**
-----------------------------------------------------------------------X

**JOHN DOE,**                                          Civil Action No: 18-cv-12150

                         **Plaintiff,**

                                                        **COMPLAINT**

                 **-against-**
                                                        **JURY TRIAL DEMANDED**

**HARVARD UNIVERSITY, HARVARD UNIVERSITY**
**BOARD OF OVERSEERS, THE PRESIDENT**
**AND FELLOWS OF HARVARD COLLEGE, and**
**BRIGID HARRINGTON, in her individual and**
**official capacity,**

                         **Defendants.**
-----------------------------------------------------------------------X

Plaintiff John Doe[1] (hereinafter referred to as "Plaintiff" or "Doe"), by his attorneys

Nesenoff & Miltenberg, LLP, as and for his Complaint, respectfully alleges as follows:

### THE NATURE OF THIS ACTION

1.      This case arises out of the actions taken and procedures employed by Defendants

Harvard University, Harvard University Board of Overseers, the President and Fellows of

Harvard College and Brigid Harrington (collectively, "Defendants") in carrying out a

procedurally flawed and biased investigation process against Plaintiff, a male freshman student

at Harvard, as a result of false allegations of nonconsensual sexual activity with fellow Harvard

student Jane Roe.[2]

2.      On April 1, 2017 Doe and Roe attended a party with other members of their

acapella group. The two were good friends and had been celebrating at a post-concert party. Both

Doe and Roe had been drinking that night and engaged in flirtatious behavior with one another.

3.      Following the party, Doe and another group member helped Roe carry equipment

back to her apartment in University housing. When they arrived at the apartment, Roe invited

---

[1] Plaintiff herewith files a Motion to proceed pseudonymously.
[2] Plaintiff refers to Roe pseudonymously.

Doe to stay the night, which he did. Thereafter, Doe and Roe engaged in consensual sexual activity. Upon waking up the following morning, Roe expressed regret about her encounter with Doe because she had a boyfriend.

4.     One month later, on May 5, 2017 Doe was notified by Harvard's Title IX Coordinator Brigid Harrington ("Harrington" or the "Investigator") that he was the subject of an investigation being conducted by Harvard's Office of Dispute Resolution ("ODR"), stemming from the encounter with Roe that occurred in the early morning of April 2, 2017.

5.     After conducting only one interview with Plaintiff, repeatedly denying him an opportunity to meaningfully respond to the allegations against him, and engaging in numerous violations of Harvard's policies, on October 18, 2017, Harrington released the Final Investigation Report (the "Final Report"), in which she found it more likely than not that Doe violated Harvard's policies on non-consensual sexual contact.

6.     Ultimately, on January 24, 2018, Plaintiff's final appeal was denied and the findings of responsibility and sanction of a four (4) semester suspension were upheld.

7.     When Defendants found Plaintiff guilty of violating Harvard's sexual harassment policy, Plaintiff was deprived of his fundamental right to a fair process and was discriminated against on the basis of his male sex, as well as his race.

8.     A non-exhaustive list of Defendants' wrongful actions include the following: (i) Defendants failed to conduct a thorough and impartial investigation when it accepted as fact uncorroborated statements and overlooked potentially exculpatory evidence; (ii) Defendants evidenced a gender bias against Plaintiff as the male accused throughout the investigative and hearing process; (iii) Defendants conducted an investigation motivated by racial bias; (iii) Defendants made assessments of credibility and evidentiary weight with respect to each party

and witness without any ascertainable rationale or logic; (iv) Defendants failed to afford Plaintiff the requisite presumption of innocence required by a preponderance of the evidence standard; (v) Defendants deprived Plaintiff of a meaningful opportunity to respond to the charges against him; and (vi) the Sanction was unwarranted and disproportionate in light of the circumstances.

9.       As a result of Defendants' discriminatory and unlawful conduct, Doe has sustained damages to his future education and career prospects as a result of the Decision and Sanction.

10.      Plaintiff therefore brings this action to obtain relief based on causes of action for, among other things, violations of Title IX of the Education Amendments of 1972, Fourteenth Amendment procedural due process, discrimination in violation of 42 U.S.C. § 1981, and state law claims.

## THE PARTIES

11.      Plaintiff, an African American male, is a natural person, citizen of the United States, and resident of the State of Ohio. During the events described herein, Plaintiff was a student at Harvard University and resided on Harvard's campus in Cambridge, Massachusetts.

12.      Defendant Harvard University is a private, liberal arts college located in Cambridge, Massachusetts.

13.      Upon information and belief, Defendant Board of Overseers is one of the governing bodies of Harvard University. It is composed of 30 members. Upon information and belief, it influences Harvard's strategic decisions, periodically reviews the quality and direction of the University, and may consent to certain actions taken by the Corporation. *See* https://www.harvard.edu/about-harvard/harvards-president-leadership.

14.     Upon information and belief, the President and Fellows of Harvard College is one of two governing bodies at Harvard. Upon information and belief, it oversees Harvard's academic, financial, and physical resources and acts as the confidential sounding board for the President. The Corporation is also responsible for approving the University's "budgets, major capital projects, endowment spending, tuition charges, and other matters." *See* https://www.harvard.edu/about-harvard/harvards-president-leadership.

15.     Upon information and belief, Brigid Harrington is a resident of the State of Massachusetts and was the Title IX Coordinator at Harvard University at all relevant times herein.

16.     Plaintiff and Defendants Harvard, the Board of Overseers, the President and Fellows of Harvard College and Brigid Harrington are sometimes hereinafter collectively referred to as the "Parties."

## JURISDICTION AND VENUE

17.     This Court has federal question, diversity and supplemental jurisdiction pursuant to 28 U.S.C. § 1331, § 1332 and under 28 U.S.C. § 1367 because: (i) the federal law claims arise under the constitution and statutes of the United States; (ii) Plaintiff and Defendants are citizens of different states and the amount in controversy exceeds $75,000.00, exclusive of costs and interest; and (iii) the state law claims are so closely related to the federal law claims as to form the same case or controversy under Article III of the U.S. Constitution.

18.     This Court has personal jurisdiction over Defendant Harvard on the grounds that the University is conducting business within the State of Massachusetts.

19. This Court has personal jurisdiction over Defendant Board of Overseers on the grounds that it is conducting business within the State of Massachusetts and is one of the governing bodies of Harvard University.

20. This Court has personal jurisdiction over Defendant President and Fellows of Harvard College on the grounds that it is conducting business within the State of Massachusetts and is one of the governing bodies of Harvard University.

21. This Court has personal jurisdiction over Defendant Harrington on the grounds that she was employed by Harvard University as its Title IX Coordinator at all relevant times herein.

22. Venue for this action properly lies in this district pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omission giving rise to the claim occurred in this judicial district.

## FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS

**I.** **Agreements, Representations, Covenants & Warranties Between Plaintiff and Defendant Harvard University**

23. Prior to matriculating at Harvard University, Doe attended a private high school in Ohio where he graduated Cum Laude with a 4.5 GPA. Doe was a four-year member of the track team, captain of the wrestling team, and played varsity football in addition to participating in other extracurricular activities outside of school. Doe was well respected in the school community, serving as the chair of his school's honor council, in addition to holding leadership in various cultural and music organizations. Doe was also active in his church, often volunteering in the children's ministry and singing in church on Sundays.

24. In the Fall of 2016, Doe began his college career as a freshman at Harvard, where he completed pre-medical coursework, with the intention of attending medical school. In

5

addition to his academic achievements, he was a devoted member of an acapella group on campus.

25.     Upon Doe's acceptance into the Faculty of Arts and Sciences ("FAS"), Defendant Harvard provided Doe with copies of its school policies, including the Sexual and Gender-Based Harassment Policy and Procedures for the Faculty of Arts and Sciences (the "Policy"), which highlights the school's policies around the investigation, discipline, and resolution procedures of sex-based complaints.

26.     The Policy states that FAS is:

> "[C]ommitted to fostering an open and supportive community that promotes learning, teaching, research, and discovery. This commitment includes maintaining a safe and healthy educational and work environment in which no member of the community is excluded from participation in, denied the benefits of, or subjected to discrimination in any University program or activity on the basis of sex, sexual orientation, or gender identity."

*See* Introduction, Sexual and Gender-Based Harassment Policy and Procedures for the Faculty of Arts and Sciences Harvard University, pg. 1, 2016.

27.     When a complaint alleging a violation of Harvard's policies is received, the Title IX Officer will assign the case to an investigator for an initial review. Based on the information gathered, the Investigator will determine whether the information, if true, would constitute a violation of the policies, thus warranting an investigation.

28.     During the investigation, the investigator will conduct interviews with the complainant, the respondent, and any witnesses.

29.     According to the Policy, "At the conclusion of the investigation, the Investigative Team will make findings of fact, applying a preponderance of the evidence standard, and determine based on those findings of fact whether there was a violation of the Policy." *See*

Introduction, Sexual and Gender-Based Harassment Policy and Procedures for the Faculty of Arts and Sciences Harvard University, pg. 17, 2016.

30.     The Policy provides a number of definitions including what constitutes sexual harassment and how to determine whether or not a hostile environment has been created. *See* Introduction, Sexual and Gender-Based Harassment Policy and Procedures for the Faculty of Arts and Sciences Harvard University, pg. 4, 2016.

31.     Other relevant sections of the Policy include details on how to request informal resolution once a complaint has already been filed with the Office of Resolution:

> "Once a complaint has been opened for investigation and before the final report has been provided to the parties, **a party may request informal resolution as an alternative to formal resolution of the complaint, but that disposition requires agreement of the Complainant and the Respondent and the approval of the Title IX Officer** in consultation with the FAS Title IX Coordinator for Faculty and the Title IX Coordinator for the School or unit with which the Complainant is affiliated."

*See* Introduction, Sexual and Gender-Based Harassment Policy and Procedures for the Faculty of Arts and Sciences Harvard University, pg. 18, 2016 [emphasis added].

32.     The Policy outlines the grounds for an appeal of the Investigator's decision, which includes "1. A procedural error occurred, which may change the outcome of the decision; or, 2. The appellant has substantive and relevant new information that was not available at the time of the investigation and that may change the outcome of the decision." *See* Introduction, Sexual and Gender-Based Harassment Policy and Procedures for the Faculty of Arts and Sciences Harvard University, pg. 18, 2016.

33.     Finally, the Policy highlights the sanctions that may be applied when a violation has occurred. According to the Policy, "Sanctions shall take into account the severity and impact of the conduct, the Respondent's previous disciplinary history (based on consultations with the

relevant Ad Board representative), any written statements submitted by the parties relevant to sanctions, and the goals of this Policy." The Policy further states that it "does not specify minimum or maximum sanctions, but a severe violation will ordinarily require that the respondent observe some period of absence from the University." *See* Introduction, Sexual and Gender-Based Harassment Policy and Procedures for the Faculty of Arts and Sciences Harvard University, pgs. 21 & 22, 2016.

34.     The Policy is in large part a product of a "guidance letter" issued to all colleges and universities in the United States on April 4, 2011, by the Office of Civil Rights ("OCR") of the U.S. Department of Education ("DOE"), widely known as the "Dear Colleague" letter ("DCL").

35.     The DCL advised recipients that sexual violence constitutes sexual harassment within the meaning of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 *et seq*. and its regulations, and directed schools to "take immediate action to eliminate the harassment, prevent its recurrence, and address its effects."

36.     In early 2013, Harvard hired its first Title IX coordinator, Mia Karvonides, who previously investigated Title IX cases for the OCR.

37.     Harvard then substantially revised its Policy in 2014, creating a central office - the Office of Sexual and Gender Based Dispute Resolution – to handle investigations, employing a campus-wide policy, and establishing a preponderance of the evidence standard.

38.     On information and belief, these changes with regard to Harvard's Title IX process came in direct response to an OCR investigation of Harvard (discussed in further detail below) and the DCL.

39.     On April 19, 2014, OCR issued additional directives to colleges and universities in the form of a guidance document titled *Questions and Answers on Title IX and Sexual Violence* ("Q&A"). Like the DCL, the Q&A was aimed at addressing educational institutions' sexual misconduct policies, including the procedures schools "must" have in place "to prevent sexual violence and resolve complaints" and the elements that "should be included in a school's procedures for responding to complaints of sexual violence."

40.     On September 22, 2017, OCR rescinded the DCL and put in place an interim guidance while the current administration reviews and revises its practices with regard to the adjudication of complaints of sexual misconduct on college campuses receiving federal funding. *See, e.g.,* https://www.ed.gov/news/press-releases/department-education-issues-new-interim-guidance-campus-sexual-misconduct.

41.     The interim OCR guidance, in a significant departure from the 2011 DCL, stated: "The findings of fact and conclusions should be reached by applying either a preponderance of the evidence standard *or a clear and convincing evidence standard*," as long as the standard for evaluating claims of sexual misconduct is the same as that applied in other student disciplinary proceedings. The interim guidance also requires that "[a]ny rights or opportunities that a school makes available to one party during the investigation should be made available to the other party on equal terms."

42.     The interim OCR guidance, as well as the accompanying review of OCR's prior guidance documents suggest that the policies and procedures in place at Harvard at all times relevant to this lawsuit – which were tailored in such a way as to comply with the DCL under threat of loss of federal funding – were unfair and, ultimately, out of step with the goal of gender

equity in Title IX-related proceedings. *See* "Q&A on Campus Sexual Misconduct," available at https://www2.ed.gov/about/offices/list/ocr/docs/qa-title-ix-201709.pdf.

43.     Notwithstanding, on November 2, 2017, the University issued a statement in response to the Federal Government's September 2017 withdrawal of the 2011 Dear Colleague Letter, affirming: "The University has reviewed the interim guidance issued last month by the U.S. Department of Education and determined that it does not, at this time, warrant changes to our University-wide Policy or Procedures." *See* https://www.thecrimson. com/article/2017/11/2/reaffirming-commitment-uncertain-times/.

## II.     Defendants' Controversial Implementation of Policy

44.     It is no secret that Harvard's policies have garnered national attention over the past several years. This is in large part due to an op-ed published in the *Boston Globe* (the "Globe") on October 15, 2014 entitled "Rethink Harvard's Sexual Harassment Policy." The opinion, which was drafted and signed by 28 professors from the Harvard Law School (the "Law School"), highlighted the professors' concerns about a new university-wide policy that was implemented in July 2014, the same policy in effect at all times relevant to Plaintiff's case.

45.     The policy was intended to prevent sexual harassment and sexual violence based on gender, sexual orientation, and gender identity. The professors wrote however that the policy was "inconsistent with many of the most basic principles we teach" including "due process of law, the substantive law governing discrimination and violence, appropriate administrative decision making, and the rule of law generally."

46.     They go on to note that "this particular sexual harassment policy adopted by Harvard will do more harm than good." Among the concerns raised by the op-ed were:

- "The absence of any adequate opportunity to discover the facts charged and to confront witnesses and present a defense at an adversary hearing;

- The lodging of the function of investigation, prosecution, fact-finding, and appellate review in one office, and the fact that that office is itself a Title IX compliance office *rather than an entity that could be considered structurally impartial;*
- The failure to ensure adequate representation for the accused, particularly for students unable to afford representation."

47. The professors noted that Harvard "inappropriately expanded the scope of forbidden contact" by, among other things:

- "Adopting a definition of sexual harassment that goes significantly beyond Title IX and Title VII law;" and

- "Adopting rules governing sexual conduct between students both of whom are impaired or incapacitated, rules which are starkly one-sided as between complainant and respondents, and entirely inadequate to address the complex issues in these unfortunate situations involving extreme use and abuse of alcohol and drugs by our students."

48. The professors further argued that the University "apparently decided simply to defer to the demands of certain federal administrative officials, rather than exercise independent judgment about the kind of sexual harassment policy that would be consistent with law and with the needs of our students and the larger university community."

49. The op-ed continues, "Harvard has adopted procedures for deciding cases of alleged sexual misconduct that lack the most basic elements of fairness and due process, are *overwhelmingly stacked against the accused*, and are in no way required by Title IX law or regulation." They wrote that there must be balance between addressing sexual harassment while also "protecting students against unfair and inappropriate discipline, honoring individual relationship autonomy, and maintaining the values of academic freedom."

50. The professors acknowledge the fact that a major driving force behind the change in policy was the threat from the federal government to withhold funds from universities "not complying with its idea of appropriate sexual harassment policy." The professors argue,

however, that "Harvard University is positioned as well as any academic institution in the country to stand up for principle in the face of funding threats. The issues at stake are vitally important to our students, faculties, and entire community."

51.    Concluding "The university's sexual harassment policy departs dramatically from these legal principles, jettisoning balance and fairness in the rush to appease certain federal administrative officials," the professors close their op-ed with a call to the university to "withdraw this sexual harassment policy and begin the challenging project of carefully thinking through what substantive and procedural rules would best balance the complex issues involved in addressing sexual conduct and misconduct in our community."

52.    Defendants failed to heed the advice of the professors however and reaffirmed Harvard's commitment to the policies in place. It was this same Policy that was used in the investigation and adjudication of Doe's case.

### III.    The Department of Education Investigates Harvard's Compliance with Title IX

53.    Following the release of the DCL, as well as the additional Q & A, the DOE opened investigations into a number of colleges and universities around the country. The subjects of those investigations were at risk of losing federal funding if they were not in compliance with the DCL, and other DOE directives.

54.    In 2014, following a multi-year investigation, the OCR found Harvard Law School (the "Law School") to be noncompliant with Title IX. As part of its resolution agreement with OCR, in 2015 the Law School drafted and moved to adopt a set of procedures aimed to remedy the flaws it saw in the university wide policy. Departing from university wide policy, changes to the proposed law school policy included, among other things: legal counsel for all parties involved; a panel comprised of trained, unaffiliated professionals; and, the incorporation

of hearings into the process. *See* https://www.thecrimson.com/article/2015/1/3/pending-procedures-law-school-title ix/?page=single.

55. There are currently three active OCR investigations against Harvard- one pertaining to an incident that allegedly occurred in 2014, before the new policies were implemented at Harvard, and two were opened in 2016 and 2017 and involve matters that have occurred since the introduction of new policies.

56. Upon information and belief, all three investigations are still ongoing.

**IV.** **The Events of April 1-2, 2017**

57. On the evening of April 1, 2017, John Doe, a freshman at Harvard, performed with his acapella group at their annual Spring concert. Following the performance, the group, which consisted of eight (8) members including sophomore Jane Roe, held an afterparty at Leverett House G-Hutch.

58. At the party, which began around 10:30 pm, the group members, including both the Plaintiff and Jane Roe, who was the President of the group at the time of the alleged incident, participated in drinking games as well as social drinking.

59. During the party, Doe and Roe were mutually flirtatious and engaged in various voluntary and consensual sexual acts. Roe was at all times an active and willing participant in the activity.

60. As the party wrapped up, Doe and another group member, Witness 1, helped Roe pack up the equipment. Witness 1 and Doe agreed to help Roe carry the equipment back to her dorm room at Mather House. Roe was able to make the entire walk back to her apartment, which consisted of traveling up seven steps, past a security guard and up approximately three flights of stairs to her suite, without trouble and without assistance.

61.     Roe realized she did not have keys to her apartment upon arrival and had to call her roommate to come and open the door for her. When her roommate arrived at the door she let Roe, Doe, and Witness 1 into the room.

62.     After entering the apartment, Roe, Doe, and Witness 1 went to Roe's room in another part of the suite.

63.     When the group got to Roe's room she immediately lay down on her bed, fully clothed. At this point she told Witness 1 and Doe to stay there until she fell asleep.

64.     Roe also whispered to Doe and explicitly invited him to stay in the room.

65.     Witness 1, assuming Roe would soon be asleep, left while Doe stayed per Roe's request.

66.     Following Witness 1's departure, Doe and Roe engaged in voluntary, consensual sexual acts. Roe was an active and willing participant in the activity.

67.     On the morning of April 2, 2017, Roe and Doe awoke together in Roe's bed.

68.     Roe went to the restroom and when she returned, she turned on the light and asked Doe why he was in her bed, in a tone that gave Doe the impression she was angry with him.

69.     Unsure how to respond, Doe stated that he was not sure but that he must have fallen asleep there the night before. Roe then asked Doe what happened between them, to which Doe replied, "Nothing."

70.     Later that afternoon, Roe texted Doe asking whether or not they had hooked up and expressing concern that she cheated on her boyfriend. Feeling guilty about his involvement in Roe's infidelity, Doe again responded that nothing happened. The tone of this conversation implied that he and Roe were tacitly agreeing to never discuss it again.

71.     On April 3, 2017, Doe met with Roe to try to clear the air and discuss what happened on the night of April 1. During that meeting, Doe indicated that he digitally penetrated Roe and performed oral sex on her but maintained that they never had intercourse. Doe maintained that their interactions were consensual and both parties were active and willing participants.

## V.     The Disciplinary Proceedings

72.     Approximately four weeks after the alleged incident, on April 27, 2017, Roe filed a complaint with the Office for Dispute Resolution ("ODR") alleging Doe sexually assaulted her on the evening of April 1, 2017 while she was intoxicated.

73.     On May 5, 2017 Doe received a letter from Title IX investigator Harrington notifying him that he was the subject of an ongoing ODR investigation.

74.     Doe was not provided with a signed and dated copy of the initial complaint until the end of June – nearly two months after the complaint was initially filed. Absent the signed and dated complaint, Doe submitted a written response to the allegations on May 23, 2017.

75.     While Doe was out of the country for the summer, Defendants asked him repeatedly to participate in an investigatory interview over the phone. Doe, who preferred to appear for an interview in person, requested that the interview be conducted when he returned to campus for the fall semester. However, Harrington declined his requests and coerced him into appearing for the interview by phone when she refused to provide Doe with the evidence collected thus far until he submitted to an interview.

76.     On August 16, 2017, two weeks before Doe would have returned to campus for the fall semester, he attended his one and only interview by phone. During the interview, Harrington read aloud her notes summarizing the interviews she had conducted over the course

of the investigation. Doe then read a prepared statement. Following the statement, Harrington asked Doe a few pointed questions, formulated directly in response to witness interviews that were collected *prior* to Doe's interview, which we had not had an opportunity to review previously. Doe declined to answer on the advice of counsel.

77.     An ODR fellow took typed notes of what was said during the interview. However, Doe was never provided a copy of these notes, or notes prepared during any witness interview.

78.     In August 2017, Roe initiated a discussion with Doe, through her advisor, about resolving this matter through an informal resolution, instead of Harvard's formal investigation process.

79.     Doe agreed to this proposal as it would allow the parties to amicably resolve the allegations on their own, without participating in an unnecessarily prolonged investigation process that would take away from their studies.

80.     Thus, on September 1, 2017, Roe submitted a request for informal resolution on behalf of both herself and Doe. This request was denied by Director of ODR William McCants ("McCants") "based on the severity of the alleged harassment and the potential risk of a hostile environment for others in the community." On September 18, 2017, Doe requested reconsideration of informal resolution. The request was again denied by McCants on September 21, 2017.

81.     While the denial of the informal resolution request was purportedly based on the "potential risk of a hostile environment for others in the community," McCants overlooked the fact that no official interim measures were ever put in place during the investigation to keep Doe away from "the community" or otherwise limit his time on campus in order to reduce the risk of his creating a hostile environment.

82.     The ODR provided Roe and Doe with a draft of the final investigation report on
September 25, 2017.

**VI.     <u>Failure to Perform a Thorough and Impartial Investigation</u>**

83.     Defendants failed to perform a thorough and impartial investigation into the
allegations against Plaintiff.

84.     Harrington took a number of actions during the investigation that, either
intentionally or negligently, severely skewed the process in favor of Roe.

85.     For instance, the investigation primarily focused on Roe's level of intoxication, so
as to establish her inability to consent as required by the Policy. Harrington took as fact Roe's
self-reported level of intoxication and interviewed witnesses who would confirm her account. In
contrast, Harrington failed to interview witnesses who would have refuted Roe's assertions and
corroborate Doe's claims that Roe was in fact not incapacitated.

86.     Harrington afforded unsubstantiated weight to the testimony of Roe's witnesses,
none of whom provided reliable testimony; specifically:

- Roe's roommate spent the month leading up to the filing of the complaint discussing the incident with Roe.

- Roe's boyfriend was not present on the evening of the alleged incident and only learned of the allegations from Roe herself after the fact.

- Another witness, Witness 1, who admittedly tainted the investigation by attempting to perform his own investigation and coerce Doe into confessing stopped participating halfway through the process. Nonetheless, his statement was inexplicably still included in the Report.

- Witness 1 made comments within a group chat, a copy of which was submitted to Harrington by Doe (but not included in the Final Report), that were sexual in nature and inappropriate with regard to race, gender, and sexual orientation.

87.     In addition to affording unfounded weight to the testimony of Roe's witnesses,
Harrington failed to seek out any potential exculpatory evidence including, but not limited to:

- Cell phone records to corroborate or refute Complainant's narrative.

- History of key card use to swipe in and out of campus buildings.

- Video surveillance from the residence halls where Doe and Roe interacted demonstrating Roe's ability to walk home unassisted and without displaying any visible signs of incapacitation.

88.     Further, Harrington failed to perform an impartial investigation when she continuously withheld information from Doe, depriving him of a meaningful opportunity to fully participate in the process. For instance, Doe had to repeatedly request copies of the investigator's notes from each phase of the investigation. These notes were essential to Doe's understanding of both the allegations against him as well as what evidence was being used in the matter, in order for him to form a meaningful defense.

89.     Similarly, Doe was not permitted to respond to a statement Roe made to the ODR on October 17, 2017 in response to Plaintiff's response to the Investigation Report, before the Final Report was issued. Thus, he was denied the opportunity to respond to all evidence against him, including evidence attacking his character, and information that was used by the Board when making their determination with regard to responsibility and the sanction.

90.     Finally, Harrington overlooked the Complainant's motivations for filing the complaint; namely, to justify her infidelity to her boyfriend. Plaintiff reported that Complainant's boyfriend verbally threatened him with physical violence, and assured Plaintiff that he would report him to University administrators, with the intention of getting him kicked out of school. Notwithstanding, this evidence was not given due consideration in assessing the veracity of Complainant's claims.

VII.　**Roe's Inconsistent, Uncorroborated, and Shifting Narrative**

91.　During the investigation, Roe provided uncorroborated allegations, inconsistent statements and a continually evolving narrative. Notwithstanding, the Investigator overlooked these flaring issues in arriving at the predetermined conclusion that Doe was responsible for the misconduct alleged.

92.　First, Roe told the Investigator that she went to Harvard University Health Services ("HUHS") on April 2, 2017 to "get a rape kit done." Though this visit was never confirmed to have taken place, the Investigator still noted in the Final Report that the Complainant had undergone such an exam, despite the absence of any medical records.

93.　Similarly, Roe alleged that she reported the incident to Harvard University Police Department ("HUPD") after visiting the health center. Once again, though the existence of such a police report was never confirmed, this allegation was still included in the Final Report.

94.　Roe maintained that she was unable to remember anything from the night of the alleged incident due to being intoxicated however throughout the investigation she provided differing accounts of the night. Depending on the day, Roe remembered new details or claimed to forget other information that would undermine or change her narrative of events. For example:

- Roe first stated that she participated in a drinking game with Doe and other members of the acapella group. Roe then changed her story and asserted that she never played a drinking game.

- Roe also initially claimed that she drank one shot while playing a drinking game. She then changed her version of events and told the Investigator that Doe brought her first drink of the night "out of nowhere."

- Roe gave differing accounts about the extent to which she remembered the night. In the complaint she did not mention not remembering the events of the night, yet she told one witness that she didn't remember anything from the night and told another witness she did not remember anything once she returned to her bedroom. Harrington acknowledged these inconsistencies but did not address them in the final report or consider them in assessing complainant's credibility.

95.     A trained and impartial investigator would have viewed the foregoing with skepticism and carefully explored the discrepancies in the Roe's evidence. Here, Harrington conducted a superficial and biased investigation calculated to lead to the foregone conclusion that Doe was responsible for the alleged misconduct.

**VIII.   <u>Gender Bias Evidenced Against Plaintiff</u>**

96.     The investigation was biased against Doe as the male accused of sexual misconduct.

97.     First, multiple pages and sections of the Final Report were devoted to detailing the impact the alleged incident had on Roe. This included statements made by Roe about her inability to focus, her avoidance of certain areas of campus, and her need to sleep at her boyfriend's apartment, in addition to quotes from friends who asserted that Roe was distraught and overwhelmed. *See* Final Report, pgs. 25-26.

98.     There was no similar section dedicated to Doe. In fact, Doe was never asked about the impact the allegations had on him. He was never asked how he was coping with being falsely accused of very serious allegations nor was he asked about the impact the disciplinary process was having on his daily life.

99.     Harrington accepted as fact Roe's stated level of intoxication and her assertion that Doe took advantage of her while incapacitated, a wide spread narrative in sexual misconduct claims that is based in stereotypical gender norms.

100.    Harrington overlooked any evidence tending to disprove Roe's statements. For instance, no explanation was provided, or sought, as to why Roe was able to walk back to her apartment unassisted while carrying heavy equipment, or how she was able to easily solve the issue of not having her keys to her room.

101.    Furthermore, Harrington failed to pursue potentially exculpatory evidence and a number of statements made by Doe that substantiated his version of events, including: obtaining surveillance of the night in question so as to confirm Doe's assertions that Roe was able to walk home without any issue; speaking to Roe's roommate who allegedly saw her in the bathroom on the morning following the alleged incident; and Doe's frequent submissions highlighting Roe's inconsistent and contradictory statements. Instead, she based her findings on a predetermined assumption of Doe's guilt, and took as fact the statements provided by Roe and biased witnesses.

102.    As demonstrated by the foregoing, Harrington operated under the presumption that Doe was guilty of the misconduct alleged. Rather than conduct an impartial investigation, she proceeded in a manner that would guarantee Doe would be found responsible for a violation of the sexual misconduct policies.

## IX.    The Office of Dispute Resolution Repeatedly and Arbitrarily Denied the Parties' Request for Informal Resolution

103.    Harvard's Policy offers an opportunity for the parties to enter into a voluntary informal resolution, rather than partake in the formal investigation process.

104.    The Policy states,

"Upon determining that informal resolution is appropriate, either the appropriate FAS Title IX Coordinator or, in cases where the Initiating Party makes the request to the ODR, the ODR Investigator who is assigned to the case by the Title IX Officer, will attempt to aid the parties in finding a mutually acceptable resolution." *See* pg. 13.

105.    The Policy further notes that, "A matter will be deemed satisfactorily resolved when both parties expressly agree to an outcome that is also acceptable to the appropriate FAS Title IX Coordinator." *See* pg. 13.

106.    Doe and Roe, both individually and separately, requested an informal resolution to resolve the matter. Through their respective advisors they drafted and agreed to an informal

resolution that satisfied both of their needs. However, Defendants repeatedly deny their requests for a voluntary informal resolution.

107.    At no point did Defendant provide a rationale for rejecting the parties' informal resolution. The only explanation given to the parties was that the denial was "based on the severity of the alleged harassment and the potential risk of a hostile environment for others in the community." Yet, the failure to impose interim sanctions against Plaintiff while the investigation was ongoing, as well as the joint nature of the resolution as agreed to between both parties, severely undercut this pretextual justification.

108.    Nowhere in the policies is there a breakdown of what constitutes allegations that may or may not go through the informal resolution process, of what is considered too severe to be considered, or what constitutes an "acceptable" outcome with regard to the Title IX Coordinator.

109.    To this day Defendant has failed to cite to the specific policy provision, or any other basis, that allows for such a blatant refusal.

**X.    Decision & Sanctions**

110.    On October 18, 2017, the investigator released the Final Report, concluding: "given the totality of the circumstances, the Investigator finds pursuant to Section VI.C.vii of the FAS Procedures that it was more likely than not that Respondent either touched Complainant's 'private parts,' engaged in oral sex with Complainant, or did both. In any case, this was conduct of a sexual nature, occurring when she was incapable of requesting or inviting the conduct, and was sufficiently severe that it interfered with or limited Complainant's ability to participate in or benefit from education or work programs or activities." *See* Final Report, pg. 7, 2017.

111.     On October 25, 2017, Plaintiff appealed the Final Report produced by the ODR, contesting the findings based on procedural error and maintaining that he did not violate the Policy.

112.     After reviewing Plaintiff's appeal, the Appellate Panel (the "Panel"), which was comprised of Patricia Byrne, Gail Gustafson, and Daniel Ziblatt, informed Doe by letter, signed by Gustafson, Chair of the Panel, that it had been determined that no procedural error had occurred and affirmed the original finding of responsibility.

113.     On November 7, 2017 the Administrative Board ("Board") determined that Plaintiff must withdraw from Harvard for a total of four (4) semesters (the "Sanction"), inclusive of the fall 2017 semester. Thus, Plaintiff will not be permitted to return to Harvard until the fall semester of 2019.

114.     On November 28, 2017, Plaintiff appealed the Sanction imposed by the Board.

115.     The appeal, which was forwarded to the Dean of the College, was denied on December 19, 2017.

116.     On January 8, 2018 Plaintiff communicated his concerns regarding the outcome of this matter and submitted a number of documents – including his appeal, the Dean's response, and other case material – for reconsideration.

117.     On January 25, 2018, Plaintiff received a response from Susan Lively, Secretary of the Faculty for FAS, stating that there was no basis for the reconsideration to proceed, thus ending the university's disciplinary process and upholding the Decision and Sanction.

**AS AND FOR A FIRST CAUSE OF ACTION**
**Violation of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 *et seq*.**
**Erroneous Outcome**
**(Against Harvard University)**

118.   John Doe repeats and realleges each and every allegation hereinabove as if fully set forth herein.

119.   Title IX of the Education Amendments of 1972 provides, in relevant part, that: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."

120.   Title IX of the Education Amendments of 1972 applies to all public and private educational institutions that receive federal funding, which includes Defendant Harvard.

121.   Upon information and belief, Harvard received over $72.6 million dollars in 2017 and $70.3 million dollars in 2016 in federal loan funding as well as $618 million in 2017 in federal grants.

122.   At all times relevant to this litigation, Harvard was obligated to conform its policies to the requirements of the DCL, at the risk of de-funding penalties by the federal government.

123.   Title IX may be violated by a school's failure to prevent or remedy sexual harassment or sexual assault or by the imposition of university discipline where gender is a motivating factor in the decision to discipline. In either case, the statue is enforceable through an implied private right of action.

124.   Both the Department of Education and the Department of Justice have promulgated regulations under Title IX that require a school to "adopt and publish grievance procedures providing for the *prompt and equitable resolution* of student…complaints alleging

any action which would be prohibited by" Title IX or regulations thereunder. 34 C.F.R. § 106.8(b) (Dep't of Education); 28 C.F.R. § 54.135(b) (Dep't of Justice) (*emphasis added*). Such prohibited actions include all forms of sexual harassment, including sexual intercourse, sexual assault, and rape.[3]

125.     In 2001, the Office for Civil Rights issued the "Revised Sexual Harassment Guidance: Harassment of Students by School Employees, Other Student's, or Third Parties" (the "2001 Guidance") pursuant to the Administrative Procedure Act's notice and comment rulemaking.

126.     According to the 2001 Guidance, the procedures adopted by a school covered by Title IX must not only "ensure the Title IX rights of the complainant," but must also "*[accord] due process to both parties involved…*"[4]

127.     The "prompt and equitable" procedure that a school must implement to "accord due process to both parties involved" must include, at a minimum:

- "Notice…of the procedure, including where complaints may be filed";
- "Application of the procedure to complaints alleging [sexual] harassment…";
- "Adequate, reliable, and impartial investigation of complaints, including the opportunity to present witnesses and other evidence";
- "Designated and reasonably prompt timeframes for the major stages of the complaint process"; and
- "Notice to the parties of the outcome of the complaint…"[5]

128.     A school also has an obligation under Title IX to make sure that all employees involved in the conduct of the procedures have "adequate training as to what conduct constitutes sexual harassment, which includes 'alleged sexual assaults.'"[6]

---

[3] *See generally* U.S. Dep't of Education, Office of Civil Rights, *Revised Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties – Title IX* (2001) at 19-20, 21 & nn.98-101.
[4] *Id. at* 22 (emphasis added).
[5] *Id.* at 20.

129.   To succeed on an erroneous outcome claim, a plaintiff must demonstrate there was (1) a flawed proceeding that (2) led to an erroneous outcome that was adverse to the plaintiff and (3) specific circumstances suggest gender bias led to the erroneous outcome

130.   An "erroneous outcome" occurred in this case because Doe was innocent and wrongly found to have committed a violation of Harvard's policies, and gender bias was a motivating factor.

131.   Particular circumstances suggest that gender bias was a motivating factor behind the erroneous findings and the decision to impose discipline upon Doe. These circumstances include, without limitation:

    a.   From the start, the investigation was slanted in favor of the female complainant. Her story was deemed more credible from the beginning and given more weight in the final analysis and determination of what occurred that night, despite the availability of evidence refuting her claims.

    b.   The Investigator inquired into Jane Roe's level of intoxication without making a similar inquiry into Doe's level of intoxication, despite her knowledge that both parties were consuming alcohol prior to the alleged incident.

    c.   Doe's claims, statements, and requests for further investigation into available evidence, such as verifying the existence of a police report, a medical report, or obtaining video surveillance, were repeatedly ignored or dismissed during the course of the investigation.

    d.   Defendants failed to take seriously or follow up on Doe's claims that the witnesses interviewed in the matter were biased, had been discussing the alleged incident with Roe, and had tailored their stories to match her narrative of events.

    e.   In the Final Report provided to the Board, the Investigator included multiple pages describing the impact the alleged incident had on Roe. There was no mention of the impact the alleged incident on Doe, who was forced to leave his acapella group and stay away from a number of his closest friends, nor was there any examination into how being involved in a disciplinary proceeding affected Doe. Instead, Harrington focused only on the female "victim" and chose to ignore the impact on Doe entirely.

---

[6] *Id. at* 21.

132.   Upon information and belief, Harvard was encouraged by federal officials to institute solutions to sexual violence against women that abrogate the civil rights of men and treat men differently than women.

133.   Upon information and belief, Harvard's mishandling of the Complaint was informed by internal institutional pressure, ongoing OCR investigations, as well as pressure from the United States Department of Education, under a threat of recession of federal funds.

134.   Based on the foregoing, Plaintiff was subjected to a biased, prejudiced and explicitly unfair process in violation of Title IX.

135.   This unlawful discrimination in violation of Title IX proximately caused Doe to sustain substantial injury, damage, and loss, including, without limitation, emotional distress, psychological damages, loss of educational and career opportunities, reputational damages, economic injuries and other direct and consequential damages.

136.   As a result, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

**AS AND FOR A SECOND CAUSE OF ACTION**
**42 U.S.C. § 1983- Denial of Fourteenth Amendment Due Process**
**(Against All Defendants)**

137.   Plaintiff repeats and realleges each and every allegation hereinabove as if fully set forth herein.

138.   The Fourteenth Amendment to the United States Constitution provides that no state shall "deprive any person of life, liberty, or property, without due process of law."  In this case, Defendants are state actors subject to the Fourteenth Amendment.

139.   Section 1983 of Title 42 of the U.S. Code provides in pertinent part:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to

be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. . . .

140.     Defendant Harvard in its adjudications of sexual misconduct and levying sanctions is a state actor exercising jurisdiction over sexual offenses that traditionally from the start of the American Republic have been part of the responsibilities of the states.

141.     The U.S. Supreme Court ruled in *Brentwood Acad. v. Tennessee Secondary Sch. Athletic Ass'n*, (531 U.S. 288 (2001)) that a not-for-profit athletic association's regulatory activity was state action owing to the "close nexus between the state and the challenged action," the pervasive entwinement of state school officials in the association's structure and the lack of a countervailing reason against attributing activity to the government. In so ruling, the U.S. Supreme Court reviewed the various circumstances in which an ostensibly private actor has been treated as a state actor, 531 U.S. at 296:

(i)     when the challenged activity results from the State's exercise of "coercive power" and provides "significant encouragement, either overt or covert," *Blum* v. *Yaretsky,* 457 U. S. 991, 1004 (1982);

(ii)    when a private actor operates as a "willful participant in joint activity with the State or its agents," *Lugar v. Edmondson Oil Co.,* 457 U. S. 922, 941 (1982);

(iii)   when a private actor is controlled by an agency of the state, *Pennsylvania v. Board of Directors of City Trusts of Philadelphia*, 353 U.S. 230 (1957);

(iv)    when the private entity has been delegated a public function by the State, *West v. Atkins*, 487 U.S. 42, 56 (1988); and

(v)     when the challenged activity is "entwined with governmental policies"; or when government is "entwined in [its] management or control," *Evans* v. *Newton,* 382 U. S. 296, 299, 301 (1966).

The key tests, then, are "Government coercion," "willful participation by the private actor," "Government control," "delegation of public function to private entity," and "entwinement with Government policy or Government management or control."

133.     In this case, with respect to Defendant Harvard's adjudication of sexual misconduct, there has been a delegation of the public function of the state in adjudicating rape and other sexual misconduct creating a "close nexus between the state and the challenged action" that ostensibly private behavior "may be fairly treated as that of the state itself" resulting from the state's exercise of "coercive power," where the state has provided "significant encouragement, either overt or covert," a private actor has operated as a "willful participant in joint activity with the state or its agents" and has been controlled by an "agency of the state" and, with the delegation of a public function by the state, such that the ostensibly private entity is "entwined with governmental policies" or when government is "entwined in [the private entity's] management or control." *Brentwood*, 531 U.S. at 296.

134.     While private universities have been fighting the state action argument on the ground that the 2011 Dear Colleague Letter was just guidance, Education Secretary Betsy DeVos in her September 7, 2017 speech treated the subject more realistically and helpful to finding state action requirements when saying, among other things:

> Washington's push to require schools to establish these quasi-legal structures to address sexual misconduct comes up short for far too many students.
> . . . .
> Through intimidation and coercion, the failed system has clearly pushed schools to overreach. With the heavy hand of Washington tipping the balance of her scale, the sad reality is that Lady Justice is not blind on campuses today. This unraveling of justice is shameful, it is wholly un-American, and it is anathema to the system of self-governance to which our Founders pledged their lives over 240 years ago.
> . . . .
>
> Schools have been compelled by Washington to enforce ambiguous and incredibly broad definitions of assault and harassment.

135.    Upon information and belief, during the Obama Administration, Harvard acted in response to the federal government's threat that colleges refusing to comply would be found in violation of Title IX and be subject to extremely substantial, indeed crippling, monetary penalties.

153.    The 2011 Dear Colleague Letter has in fact resulted in significant action and legal consequences that are continuing.  At the July 2014 Dartmouth College conference, Ms. Lhamon stated: "Our release of the 2011 DCL [Dear Colleague Letter] is widely credited with having sparked significant changes at colleges and universities as they worked to meet Title IX's requirements consistent with the 2011 DCL [Dear Colleague Letter]." Despite a different direction announced by the Trump Administration, colleges and universities have mostly continued with practices and policies in place during the Obama Administration, including Defendant Harvard, holding on to their exercise of what is state authority as a matter of ideological commitment to what is a gender biased enforcement of Title IX.

136.    Accordingly, Harvard was coerced by the federal government into complying with the Title IX investigative and adjudicatory process mandated by the April 2011 Dear Colleague Letter and by subsequent federal actions, statements, and directives.

137.    Harvard applied the investigative and adjudicatory process dictated to it by the federal government when it investigated and adjudicated the complaint against John Doe.

138.    Under clear and controlling case law, a private actor required by the United States to investigate and adjudicate the violations of a federal statute under terms and procedures dictated by the federal government is a state actor when engaging in such investigation and adjudication.

139.    When Harvard investigated and adjudicated the complaint made against John Doe, and when it sanctioned John Doe, Harvard was a state actor and was therefore required to honor the rights and guarantees set forth in the United States Constitution.

140.    In the course of Harvard's investigation and adjudication, it flagrantly violated John Doe's clearly established rights under the Due Process clause of the Fourteenth Amendment through its repeated acts of gender bias and deprivation of the minimal requirements of procedural fairness.

141.    Based on the foregoing, Harvard was acting as a state actor when it violated the rights and guarantees set forth in the Fourteenth Amendment of the United States Constitution during the investigation and adjudication of the sexual assault complaint against John Doe.

142.    A person has a protected liberty interest in his good name, reputation, honor, and integrity, of which he cannot be deprived without due process.

143.    A person has a protected property interest in pursuing his education, as well as in future educational and employment opportunities and occupational liberty, of which he cannot be deprived without due process.

144.    John Doe's constitutionally protected property interest in his continued enrollment at Defendant Harvard and to be free from arbitrary suspension and dismissal arises from the policies, courses of conduct, practices and understandings established by Harvard.

145.    John Doe's constitutionally protected property interest further arises from the express and implied contractual relationship between Harvard and John Doe.

146.    It is well established that Fourteenth Amendment due process protections are required in the higher education disciplinary proceedings.

147.     A person who has been admitted to a university, and who has paid tuition to that university, has a protected property interest in continuing his education at that university until he has completed his course of study. The state cannot deprive a person of this interest without due process.

148.     As a result, if John Doe as a Harvard student faced disciplinary action that included the possibility of suspension or dismissal if found responsible for alleged sexual misconduct, then the Due Process provisions of the Fourteenth Amendment to the United States Constitution applied to the disciplinary process that Harvard used.

149.     John Doe had obeyed all institutional rules when he was wrongly suspended for an extended period from Harvard.

150.     Under both federal and state law, John Doe had a constitutionally protected property interest in continuing his education at Harvard.

151.     John Doe was entitled to process commensurate with the seriousness of the allegations and the potential discipline, sanctions, and repercussions he was facing. The allegations in this case resulted in a sanction that will have lifelong ramifications for John Doe.

154.     Defendants deprived John Doe of his liberty and property interests without affording him basic due process, including, but not limited to, his right to a fair adjudication free of bias, his right to be informed of the evidence against him, his right to be heard by an impartial factfinder, his right to cross examine witnesses and challenge his accuser, and to have the proper burden of proof standard applied.

155.     Defendants, as well as other agents, representatives, and employees of Defendant Harvard, were acting under color of state law when they showed intentional, outrageous, and reckless disregard for John Doe's constitutional rights, including but not

limited to his right to be judged under the proper burden of proof. Defendant Harrington deprived John Doe of his liberty and property interests without affording him basic due process without good faith and thus is not afforded qualified immunity for her actions. Defendants all agreed to, approved, and ratified this unconstitutional conduct.

156.    As recently articulated by the Sixth Circuit in *Doe v. Baum*, a university disciplinary proceeding that may result in a sanction of expulsion or suspension must: (1) afford an accused student "some sort of hearing" and (2) "when the university's determination turns on the credibility of the accuser, the accused, or witnesses, that hearing must include an opportunity for cross-examination." *Doe v. Baum*, No. 17-2213, 2018 WL 4265634, at *3 (6th Cir. Sept. 7, 2018).

157.    Though the standard pronounced in *Baum* addressed the requirements in the context of a public university, there is no rational or logical basis for affording disparate constitutional protections to students who choose to attend a public university in comparison to students who choose to attend private universities, when the interests at stake and potential ramifications are just as severe.

158.    As a result of these due process violations, John Doe continues to suffer ongoing harm, including damages to his reputation and other non-economic and economic damages. In particular, suspension from Harvard denied him the benefits of education at his chosen school and also damaged John Doe's academic and professional reputation.  John Doe's lifelong goal of becoming a doctor has been shattered.

159.    Accordingly, Defendant Harrington is liable to John Doe in violation of 42 U.S.C. § 1983 for violations of the Due Process Clause of the Fourteenth Amendment, and for all damages arising therefrom.

160.    As a direct and proximate result of the above conduct, John Doe sustained damages, including, without limitation, emotional distress, loss of educational, career opportunities, economic injuries and other direct and consequential damages.   John Doe's interests in the results of the disciplinary process are significant.

161.    As a result of the foregoing, John Doe is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements and to an injunction enjoining violations of the Fourteenth Amendment in the process of investigating and adjudicating sexual misconduct complaints.

**AS AND FOR A THIRD CAUSE OF ACTION**
**<u>Breach of Contract</u>**
**<u>(Against Harvard University)</u>**

142.    Plaintiff repeats and realleges each and every allegation hereinabove as if fully set forth herein.

143.    It is well established in Massachusetts that the relationship between a student and a school is contractual in nature. The contract can include the university's policies relating to conduct and disciplinary proceedings. In determining whether a university breached any provision of its educational contract, the court will examine whether the college's actions met the reasonable expectations of the student.

144.    Doe applied to and enrolled at Harvard and paid all associated tuition, fees and expenses. Doe did so in reliance on his understanding, and with reasonable expectation that, the University would implement and enforce provisions and policies set forth in its official publications, including its Sexual and Gender-Based Harassment Policy and Procedures for the Faculty of Arts and Sciences.

145.    As such, an express contract or, alternatively, a contract implied in law or in fact was formed between Doe and Harvard.

146.    The contract contained an implied covenant of good faith and fair dealing, which implicitly guaranteed that any proceedings would be conducted with basic fairness.

147.    Based on the aforementioned facts and circumstances, Defendant breached its express and/or implied agreement(s) with Doe, and the covenant of good faith and fair dealing contained therein.

148.    Defendant committed several breaches of its agreement with Doe during the investigation and hearing process.

149.    For instance, Harvard's Sexual Misconduct Policy allows a party to "request informal resolution as an alternative to formal resolution of the complaint."

150.    Roe and Doe repeatedly requested informal resolution, both individually and separately.

151.    Defendant's denied the requests each time, providing little to no explanation to why the requests were deprived of the available alternative. This denial, without sufficient explanation, was in direct contradiction to the guarantees outlined in the Sexual Misconduct Policy and was a breach of the contract entered into between Harvard and Doe.

152.    Doe was also denied the opportunity to respond to all information. Harvard's Policy provides that "prior to the conclusion of the investigation, the Investigator will request individual follow-up interviews with the Complainant and the Respondent to give each the opportunity to respond to the additional information."

153.    Notwithstanding, Plaintiff was never contacted for a second interview and was not provided an opportunity to respond to additional information obtained prior to the issuance of the

Final Report. Consequently, there was information contained in the Final Report that Doe had never seen before and had not had a chance to respond to.

154.     Harrington repeatedly denied Doe's request to review all evidence collected, requiring him to appear for an interview and respond to the allegations against him without having had an opportunity to review all evidence against him.

155.     As a direct and foreseeable consequence of the above conduct, Plaintiff sustained damages, including, without limitation, loss of educational and career opportunities, economic injuries, and other direct and consequential damages.

156.     As a result of the forgoing, Plaintiff is entitled to damages in an amount to be determined at trial.

**AS AND FOR A FOURTH CAUSE OF ACTION**
**Breach of the Covenant of Good Faith and Fair Dealing**
**(Against Harvard University)**

157.     John Doe repeats and realleges each and every allegation hereinabove as if fully set forth herein.

158.     Defendant had a duty, either under an express or implied contract or as a matter of common law, to ensure that the proceedings against Doe were conducted in good faith and with basic fairness.

159.     Defendant breached this duty of good faith and basic fairness by, without limitation:

   a.   Failing to provide Doe with the same protections explicitly given to Roe under the Policy, including, but not limited to the right to a safe, healthy, and non-discriminatory educational environment; and the right to a presumption of innocence unless and until the investigation, based on a finding of the preponderance of the evidence, warrants a finding of responsibility.

   b.   Failing to allow the parties to engage in informal resolution when both parties requested resolution, and such requests were generally permitted by the

Policy.

    c.    Failing to further investigate conflicting accounts of Roe's incapacitation and inability to consent when the evidence showed that she was neither incapacitated nor unable to consent.

160.    In failing to afford Plaintiff the rights guaranteed to him by Harvard's policies concerning the investigation and adjudication of sexual misconduct charges, Defendants deprived Plaintiff of the adequate, reliable and impartial investigation to which he was entitled.

161.    Defendant's breach of duty to ensure basic fairness proximately caused Doe to sustain damages including, but not limited to: mental anguish, severe emotional distress, injury to reputation, past and future economic loss, loss of educational opportunities, and loss of future career prospects.

162.    As a result of the foregoing, Doe is entitled to damages in an amount to be determined at trial.

**AS AND FOR A FIFTH CAUSE OF ACTION**
**<u>Violation of 42 U.S.C. § 1981-Racial Discrimination</u>**
**<u>(Against All Defendants)</u>**

163.    John Doe repeats and realleges each and every allegation hereinabove as if fully set forth herein.

164.    The Civil Rights Act of 1964, 42 U.S.C. Section 1981 prohibits discrimination based on race, as follows:

All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

165.    The phrase "to make and enforce contracts" refers to the making, performance, modification and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C.A. § 1981 (West).

166.    In order to make a claim of racial discrimination under 42 U.S.C. § 1981, a plaintiff must show that the defendant intentionally discriminated against the plaintiff on the basis of race and that the defendant's actions were motivated by discrimination.

167.    The FAS Handbook (the "Handbook") further notes that, "Discrimination based on race, color, ex, gender identity, sexual orientation, religion, creed, national origin, age, ancestry, veteran status, disability, military service, or any other legally protected basis is contrary to the principles and policies of Harvard University." (*See* https://handbook.fas.harvard.edu/book/discrimination)

168.    To show that racial discrimination has occurred, a plaintiff may use direct or indirect evidence to demonstrate that the defendant's intentional discrimination caused the challenged action.

169.    Here, Doe, an African-American male, was denied the opportunity to participate in informal resolution, even after both parties had independently come to an agreement via their attorneys. No legitimate reason was provided to the parties for this denial. The only explanation Plaintiff received was a brief response informing him that informal resolution was denied due to the "seriousness of the alleged conduct."

170.    When Roe, also an African-American student, requested informal resolution, she was similarly denied. The response she received stated that the rejection was based on the "severity of the alleged harassment and the potential risk of a hostile environment for others in the community."

171.     This reasoning is tenuous at best especially considering no interim measures were put in place to otherwise temper the "seriousness" of the conduct or minimize the "risk of a hostile environment."

172.     Defendants could not point to any policy or other articulable reason for their denial of the request for informal resolution in this case.

173.     Upon information and belief, informal resolution has been permitted by Defendants in other similar actions involving sexual misconduct where the parties were Caucasian.

174.     The foregoing demonstrates that Defendants provided ambiguous and unfounded reasons for their denial of the informal resolution agreement, treated Doe, and Roe for that matter, differently than white students in similar situations, and acted without regard to the scope and parameters of the Policy.

175.     The entire investigation was tainted by racial discrimination on the part of Defendants, and contributed to an erroneous finding of responsibility against Plaintiff.

176.     As such, Doe was denied the full and equal benefit of the law due to his status as an African-American male.

### AS FOR A SIXTH CAUSE OF ACTION
#### Negligence
#### (Against All Defendants)

177.     In order to state a negligence claim under Massachusetts law, a plaintiff must show that the defendant owed the plaintiff a duty of reasonable care; that the defendant breached such a duty; damage occurred; and the damage was a result of the breach.

178.     Plaintiff must establish each element, including the presence of a duty arising under Massachusetts tort law.

179.    According to Massachusetts state law, "a duty finds its 'source in existing social values and customs' or where a defendant has voluntarily assumed a duty." (*Doe v. Amherst Coll.,* 238 F. Supp. 3d 195, 228 (D. Mass. 2017))

180.    Here, the Defendants formed a university-student relationship with Doe and had a duty to him to conduct the disciplinary process with due care, to perform an investigation free from bias or conflict and to have proper training in investigating and evaluating the alleged conduct under Harvard's policies.

181.    The foregoing duties were breached when Doe did not receive the full protection of the disciplinary process, and was subjected to a biased and prejudiced procedure.

182.    Doe's injury was caused by Defendants' breach of its duties owed to him as a student of the University. He suffered immeasurable harm in the form of delayed educational opportunities, lost or postponed career opportunities and wages, emotional and psychological damage, and reputational harm.

183.    These damages are directly related to Defendants' breaches.

## PRAYER FOR RELIEF

**WHEREFORE**, for the foregoing reasons, Plaintiff John Doe demands judgment against Defendants as follows:

(i)    on the first cause of action for violation of Title IX of the Education Amendments of 1972, a judgment awarding Plaintiff damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and career opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs, and disbursement;

(ii)     on the second cause of action for violation of constitutional due process under 42 U.S.C. § 1983, a judgment against the individual Defendants awarding John Doe:

> (a) damages from Defendant Harrington in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and athletic opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements, and

> (b) an injunction enjoining violations of the Fourteenth Amendment in the process of investigating and adjudicating sexual misconduct complaints, ordering the ending of the suspension and the re-admission of John Doe in classes at Harvard as a student and granting clearing of John Doe's transcript of the disciplinary record;

(iii)     on the third cause of action for breach of contract, a judgment awarding Plaintiff damages in an amount to be determined at trial, including, without limitation, past and future economic losses, loss of educational and career opportunities, and loss of future career prospects.

(iv)     on the fourth cause of action for breach of the covenant of good faith and fair dealing, a judgment awarding John Doe damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and career opportunities, and loss of future career prospects;

(v)     on the fifth cause of action for discrimination based on race under 42 U.S.C. § 1981, a judgment against all Defendants awarding Plaintiff an injunction against violations of the United States Constitution in the process of investigation and adjudicating sexual misconduct complaints and, against the individual Defendants, damages in an amount to be determined at trial, including, without limitation, punitive damages, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and career opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs, and disbursement;

(vi)     on the sixth cause of action for negligence, a judgment awarding Plaintiff damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and career opportunities, and loss of future career prospects;

(vii)    an injunction directing Harvard to: (i) reverse the outcome and findings regarding Roe's complaint; (ii) expunge Plaintiff's disciplinary record; (iii) remove any record of Plaintiff's suspension from his education file; and (iv) permanently destroy any record of Roe's complaint; and

(viii)   awarding John Doe such other and further relief as the Court deems just, equitable and proper.

## JURY DEMAND

Plaintiff John Doe herein demands a trial by jury of all triable issues in the present matter.

**Dated: New York, New York**
         **October 15, 2018**

                              **Respectfully submitted,**

                              **NESENOFF & MILTENBERG, LLP**
                              *Attorneys for Plaintiff*


                              **By:** *s/ Tara J. Davis*
                                  **Andrew T. Miltenberg, Esq.**
                                  **Tara J. Davis, Esq.**
                                  **363 Seventh Avenue, Fifth Floor**
                                  **New York, New York 10001**
                                  **(212) 736-4500**
                                  **amiltenberg@nmllplaw.com**
                                  **tdavis@nmllplaw.com**