UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

JOHN DOE,

        Plaintiff,

   v.

HARVARD UNIVERSITY, HARVARD
UNIVERSITY BOARD OF OVERSEERS,
THE PRESIDENT AND FELLOWS OF
HARVARD COLLEGE, and BRIGID
HARRINGTON, in her individual and official
capacity,

        Defendants.

Civil Action No. 1:18-cv-12150-IT

Leave to file under seal granted January 4,
2019

**DEFENDANTS' MEMORANDUM IN SUPPORT OF THEIR MOTION TO
<u>DISMISS THE COMPLAINT</u>**

Pursuant to Federal Rule of Civil Procedure 12(b)(6) and Local Rule 7.1(b), Defendants Harvard University, President and Fellows of Harvard College (together "Harvard"), and Brigid Harrington submit this Memorandum in support of their Motion to Dismiss the Complaint.

## INTRODUCTION

Plaintiff John Doe, a Harvard College student, was suspended by Harvard for four semesters after a school investigation concluded by a preponderance of the evidence that he had sexually assaulted a fellow student ("Jane Roe") in her dorm room by performing sexual acts on her when she was too intoxicated to give consent.  Consistent with Harvard's policies, Plaintiff was afforded numerous opportunities to provide his version of events, name witnesses, identify evidence, and comment on the evidence gathered in the course of the investigation.  Ultimately, however, the investigator (Harrington) found the statements of Roe and her roommate more credible than Plaintiff's claim that Roe was not too impaired to consent.  In reaching that conclusion, the investigator relied in part on Plaintiff's own statements.  For example, just hours after the incident, Plaintiff told Roe she had been "███████," and repeatedly attempted to convince her that no sexual contact occurred, only to admit a day later that he had, in fact, digitally penetrated and performed oral sex on her.  Roe consistently stated she had no memory of those events; she remembered only waking up in her bed the morning after attending a party with Plaintiff, confused and upset to find Plaintiff next to her.  Roe's roommate, who was sober and had to let Roe into their suite just prior to the assault, stated Roe was "███████," was repeating herself and slurring her speech, laid down upon entering the room, and needed the aid of Plaintiff and another student to get inside and to her bedroom.  Harvard's investigator detailed all of this, and more, in a 35-page report supporting her conclusion.

Plaintiff has sued, alleging six causes of action against Harvard and three against Harrington, founded on allegations that the investigation was inadequate and motivated by

gender and racial bias. The claims are baseless. Plaintiff disagrees with the outcome of Harvard's investigation and seeks through this lawsuit to relitigate Harvard's decision. But the legal claims he has pleaded require evidence of *bias*, and he simply alleges no such evidence. Numerous courts have dismissed similar complaints alleging without specific factual support that purported procedural deficiencies were the result of some unstated bias against the accused student. The Complaint should be dismissed.

## BACKGROUND[1]

### A.   Harvard's Policies And Procedures.

Harvard University enacted a *Sexual and Gender-Based Harassment Policy* and associated University Procedures, which were adopted by Harvard's Faculty of Arts and Sciences ("FAS") ("Policy" and "Procedures," attached as Exhibit A to the Declaration of Patrick D. McKegney ("Ex. A"))[2] in connection with the investigation of on-campus, student-on-student alleged sexual assault, such as the assault alleged by Roe. The Policy prohibits "unwelcome conduct of a sexual nature . . . sufficiently severe, persistent, or pervasive" to interfere with a student's education. Ex. A at 4. Conduct is deemed unwelcome "when a person is so impaired or incapacitated as to be incapable of requesting or inviting the conduct, . . . provided the respondent knew or reasonably should have known of the person's impairment or incapacity." *Id.* at 5. "The person may be impaired or incapacitated as a result of drugs or alcohol or for some other reason, such as sleep or unconsciousness." *Id.*

---

[1] Because this is a motion to dismiss, Defendants recite the factual allegations of the Complaint and, for purposes of this motion only, do not contest their accuracy.

[2] Because the Complaint refers repeatedly to the Policy and Procedures, *see, e.g.*, Compl. ¶¶ 25-33, it is "incorporated into the complaint by reference" for purposes of this motion. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007). The Policy and Procedures in turn incorporate the Harvard University Procedures for Handling Complaints Involving Students Pursuant to the Sexual and Gender-Based Harassment Policy (attached as Exhibit B to the Declaration of Patrick D. McKegney ("Ex. B")), which Plaintiff also refers to in his Complaint, Compl. ¶¶ 43-44, 52, and which were provided to him "during the course of the investigation." Ex. C at 2 n.4.

Under the Procedures, a complainant may file a formal written complaint with Harvard University's Office for Dispute Resolution ("ODR"), and an ODR investigator is then assigned to the case. Compl. ¶ 27; Ex. A at 13-14. The investigator invites both parties to submit evidence, suggest witnesses, and communicate with her on an ongoing basis; interviews the parties and witnesses; reviews documentary and other material evidence; and gives the parties opportunities to respond to the evidence before drafting a preliminary report that is provided to both parties. Ex. A at 15-17. The parties may then comment on the preliminary written report or suggest further avenues of inquiry. *Id.* at 17. The investigator then prepares a final report, making findings of fact by a preponderance of the evidence, and determining whether the conduct at issue violated the Policy. *Id.* Both parties have the right to appeal to a neutral panel based on a procedural error or new information. *Id.* at 18-19. If the findings are not overturned, the final report is then submitted to Harvard College's Administrative Board ("Ad Board"), which determines the appropriate disciplinary action, subject to another appeal. *Id.* at 21-23.

**B.     Roe's Title IX Complaint And ODR's Investigation.**

On April 27, 2017, Roe filed a complaint with ODR alleging Plaintiff sexually assaulted her in her dorm room in the early morning of April 2, 2017, while she was "███████ ███████." ODR Final Report ("Report," attached as Exhibit C to the Declaration of Patrick D. McKegney ("Ex. C")) at 1.[3] ODR Investigator Brigid Harrington investigated Roe's complaint, beginning with a May 1, 2017 interview of Roe. *Id.* at 3. After conducting an initial review and determining that Roe's allegations, if true, would constitute a violation of the Policy and warranted an investigation, ODR provided Plaintiff with Roe's complaint on May 5 and

---

[3] As with the Policy and Procedures, the Complaint repeatedly references ODR's Report. Compl. ¶¶ 86, 92-94, 97-101, 110, 131. The Report is therefore "incorporated into the complaint by reference." *Tellabs*, 551 U.S. at 322.

offered him the opportunity to respond. *Id.* at 4.  After receiving three extensions, *id.* at 4, Plaintiff responded on May 23, denying that he "████████████████" Roe, but declining to comment further. *Id.* at 1.  On the same day, ODR offered Plaintiff an interview to address the allegations, but he declined. *Id.* at 4.

In May and June 2017, the investigator gathered evidence from Roe and Plaintiff and interviewed three witnesses Roe identified; Plaintiff did not identify any supporting witnesses. *Id.* at 4-6.  Per Plaintiff's Complaint and ODR's Report, the evidence was as follows.

1. *The party and the assault.*  On April 1, 2017, Plaintiff and Roe performed with their a capella group, and then attended an afterparty hosted by another group member ("Witness 1") that began around 10:30 p.m.  Compl. ¶¶ 57-58.  Roe stated she had "████████████████" shots of liquor at the party.  Ex. C at 10.

Between midnight and 3 a.m. on April 2, Plaintiff and Witness 1 walked Roe back to her suite.  Compl. ¶ 60; Ex. C at 13-14, 17.  Because Roe did not have her key, she called her roommate ("Witness 3") to let them in.  Compl. ¶ 61; Ex. C at 14-15.  Witness 3 had not had any alcohol that night.  Ex. C at 15.  She said that when she opened the door to let Roe in, Witness 1 and Plaintiff "████████████████████" and that Roe then "████████████████." *Id.* Witness 3 observed that Roe was "████████," repeating herself, and "████████████████ ████████████," and recalled Roe had to be carried to her bedroom. *Id.* at 15, 32-33. Witness 1 said Roe was "████████████" when they arrived at her dorm, and that he had to carry her to her room.  Compl. ¶ 62; Ex. C at 16-17.

When Witness 1 left Plaintiff and Roe in the room some time thereafter, Roe was fully clothed, shoes on, and falling asleep on her bed.  Compl. ¶ 65; Ex. C at 16.  Plaintiff spent the night in Roe's bed.  Ex. C at 17-18.  It is now undisputed that Plaintiff "digitally penetrated" and

"performed oral sex" on Roe during that time.  Compl. ¶¶ 66, 71.  Roe has consistently stated she

has no recollection of those sexual acts, nor any events after returning to her dorm suite in the

early morning of April 2, 2017.  Ex. C at 17, 23, 31.

2. *The aftermath of the assault.*  Roe awoke the next morning, "███████," and upset

and confused to find Plaintiff beside her.  Compl. ¶¶ 67-68; Ex. C at 17-18.  Plaintiff

acknowledges Roe was "angry with him" and asked why he was in her bed and what had

happened the night before, to which he responded "[n]othing."  Compl. ¶¶ 68-69.  Witness 3,

who spoke to Roe the morning of April 2, similarly stated Roe was "█████."  Ex. C at 18.

Later the same morning, Roe texted Witness 1 to ask "█████████████

█████?"  *Id.* at 19.  Roe also texted Plaintiff to ask again what had happened the night

before and why he had been in her room.  *Id.* at 18.  Plaintiff maintained that "█████

█████" and that he and Witness 1 "████████████████" and "████████

█████████."  *Id.*  When Roe pressed for more details, Plaintiff stated that "█████

████████████████████████████████████

████████████████████."  *Id.* at 18-19.  He continued:

"████████████████████████████████████████."

*Id.* at 19.  On April 3, Plaintiff met Roe in person and reversed course, admitting to Roe that he

had in fact digitally penetrated and performed oral sex on her.  Compl. ¶ 71; Ex. C at 22-23.  Roe

told the investigator that she then went to Harvard University Health Services for a sexual assault

forensic exam and reported the incident to the Harvard University Police Department.  Ex. C at

24.  Roe declined ODR's request to authorize disclosure of those records.  *Id.* at 13 n.20.

3. *Follow-up interviews and Plaintiff's narrative.*  ODR offered both parties follow-up

interviews to give them "████████████" to the foregoing evidence.  *Id.* at 6-7.  Roe

was interviewed on June 21.  *Id.* at 6.  Plaintiff was overseas and asked for an extension, which ODR granted.  *Id.*  His interview occurred on August 16.  *Id.* at 7; Compl. ¶ 76.

During Plaintiff's interview, the investigator read to Plaintiff her notes summarizing the evidence she had collected.  Ex. C at 6-7; Compl. ¶ 76.  Rather than respond to the evidence, Plaintiff read a prepared statement, and then declined to answer any follow-up questions.  Compl. ¶ 76.  On August 28 and September 18, Plaintiff submitted lengthy letters challenging the evidence the investigator described.  Report Exs. 8, 11.  Plaintiff, however, never identified any potential witnesses to support his version of events.

Although he would not provide to the investigator any comment on his own conduct at the time, Plaintiff's general narrative during the ODR proceeding was that Roe was not incapacitated, pointing primarily to Roe's ability to walk from the party to her dorm while carrying equipment, and her ability to think to call her roommate to get into the suite.  *Id.* at 13-14.  He urged the investigator to adopt his theory that Roe was feigning a lack of memory out of concern about "███████████████" with her boyfriend.  *Id.* at 20, 30.  Plaintiff now concedes that the sexual acts occurred, but alleges in conclusory fashion that they were consensual (*i.e.*, that Roe had capacity to consent).  Compl. ¶¶ 3, 66, 71.

### C.   The Request For Informal Resolution.

On August 4, 2017—more than three months after Roe filed her ODR complaint—Plaintiff requested "██████████" of the ODR complaint, Ex. C at 7, which "requires the agreement of the Complainant and the Respondent and the approval of the Director of ODR in consultation with" other Harvard officials.   Ex. B at 7.  The ODR Director consulted with Harvard's Title IX Officer and the College about Plaintiff's request; the request was denied on August 8.  Ex. C at 7.  Plaintiff requested reconsideration (a process not provided for in the Procedures), which was denied.  *Id.*  On September 1, after Plaintiff's attorney spoke with Roe's

attorney, Roe requested informal resolution on behalf of both parties. *Id.* The ODR Director consulted with the Title IX Officer and the College and notified Roe on September 12 that her request was denied. *Id.*; *see* Compl. ¶ 80; Ex. B at 1 (stating standard governing informal resolution requests). On September 18, Plaintiff asked the ODR Director to reconsider (which, again, is not provided for in the Procedures); the Director declined. Compl. ¶ 80; Ex. C at 7.

> ### D. ODR's Final Report and Plaintiff's Appeal.

On September 25, 2017, pursuant to the Policy, ODR shared a draft investigation report with the parties. Compl. ¶ 82; Ex. C at 7. On October 10, after receiving two extensions, Plaintiff submitted a 23-page response in which he challenged the report's findings. Report Ex. 12. Roe submitted a two-page response to Plaintiff's comments on October 17. Report Ex. 13. The next day, ODR issued its final, 35-page report. Ex. C at 1. The investigator concluded that Plaintiff engaged in sexual conduct with Roe on the night in question, Ex. C at 28-30, which Plaintiff now admits in his Complaint. Compl. ¶ 71.

The Report further concluded that Plaintiff had violated the Policy by engaging in those sexual acts with Roe while she was incapable of consenting, *id.* ¶ 110; Ex. C at 1-2, 30-34, and that Plaintiff knew or should have known as much. Ex. C at 32-34. The investigator carefully reviewed the evidence and made determinations about witnesses' credibility. For example, she gave little weight to Witness 1's statements for a variety of reasons, *id.* at 28-30, 34, and gave no weight at all to the testimony of another party attendee ("Witness 2"). *Id.* at 31 n.31. The investigator explained, however, that she found Roe and Witness 3 (Roe's roommate) credible based on, among other things, their candor and level of detail about key matters. *Id.* at 30, 32-33. The report relied heavily upon Witness 3, who described in detail that Roe " █████████ █████████████████," and who was " ██████████████████ " who had not consumed alcohol. *Id.* at 32-33. By contrast, the investigator noted that Plaintiff's claim that Roe was not

visibly incapacitated was undermined by his own text messages, in which, in response to Roe stating she had no memory of events, he informed Roe she was "█████████" when he "█████████████████████." *Id.* at 32.

Plaintiff's appeal was unsuccessful, and on November 7, 2017, the Ad Board determined that he should be suspended from Harvard for four semesters.  Compl. ¶¶ 112-13.  Plaintiff sought an appeal and reconsideration of the Ad Board's sanction, which were denied.  *Id.* ¶¶ 114-17.  Plaintiff is eligible to return to campus in September 2019.

### E.  Plaintiff's Complaint.

Plaintiff filed this suit on October 15, 2018, alleging six causes of action against Harvard: (1) a Title IX gender bias claim; (2) a constitutional due process claim under 42 U.S.C. § 1983; (3) breach of contract; (4) breach of the covenant of good faith and fair dealing; (5) racial discrimination under 42 U.S.C. § 1981; and (6) common law negligence.  The Section 1983, Section 1981, and negligence claims are also brought against Harrington individually.

### ARGUMENT

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotations omitted).  "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct," the complaint must be dismissed. *Id.* at 679.

### I.    PLAINTIFF'S TITLE IX CLAIM SHOULD BE DISMISSED BECAUSE HE HAS NOT PLAUSIBLY ALLEGED THAT GENDER BIAS WAS A MOTIVATING FACTOR.

Title IX provides that "[n]o person in the United States shall, on the basis of sex, be . . . subjected to discrimination under any education program or activity receiving Federal financial assistance."  20 U.S.C. § 1681(a).  That provision is enforceable through an implied

private right of action under "certain limited circumstances." *Davis v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 639-40, 643 (1999). Here, Plaintiff brings an "erroneous outcome" claim, which requires "evidence (1) that would cast some articulable doubt on the accuracy of the outcome of the disciplinary proceeding and (2) show gender bias was a motivating factor." *Doe v. Trs. of Boston Coll.*, 892 F.3d 67, 91 (1st Cir. 2018) ("*Boston College*") (internal quotations omitted).[4]

Plaintiff now admits that he engaged in sexual conduct with Roe in the early morning of April 2, 2017. Compl. ¶ 71. His claim therefore focuses on ODR's conclusion that he knew or should have known Roe was too impaired to consent to those sexual acts.

Plaintiff has not plausibly alleged that gender bias played any role in Harvard's conclusion. To satisfy that requirement, Plaintiff "cannot rest on superficial assertions of discrimination," but must plead "particular circumstances" that show "there was a causal connection between the outcome of [the] disciplinary proceedings and gender bias." *Boston College*, 892 F.3d at 91. Importantly, even if Plaintiff had adequately pleaded that Harvard treated Roe "more favorably than Plaintiff during the disciplinary process"—which he has not— that still would not suffice to state a claim that Harvard acted out of *gender bias* under Title IX; Plaintiff instead must plead facts showing "that the disparate treatment was *because of* Plaintiff's sex." *Doe v. Univ. of Mass.-Amherst*, 2015 WL 4306521, at *8 (D. Mass. 2015) (emphasis in original); *see id.* ("Plaintiff has not cited examples of any comments that targeted him based on his gender—as opposed to his status as a student accused of sexual assault—or any conduct suggestive of gender bias."). Courts routinely dismiss complaints that allege a flawed proceeding led to an erroneous outcome and merely tack on "a conclusory allegation of gender

---

[4] Harvard disputes that Plaintiff has plausibly alleged the first requirement of an erroneous outcome claim—that there is "articulable doubt" about the outcome. But for purposes of this motion only, Harvard does not address that requirement because Plaintiff's claim fails for the independent reason that he does not plausibly allege gender bias.

discrimination." *Doe v. W. New England Univ.*, 228 F. Supp. 3d 154, 188-89 (D. Mass. 2017).

But conclusory allegations of gender discrimination are all the Complaint provides. Plaintiff does not cite any direct or even indirect evidence that Harrington or any other Harvard administrator acted out of a bias against men.  He does not, for example, allege that any statements were made, or that any documents exist, evidencing or even allowing for an inference of any such bias.  Instead, Plaintiff raises a number of complaints about his specific investigation, and then leaps—without any supporting factual allegations—to the conclusion that those purported deficiencies *must have been* due to gender bias.  *See* Compl. ¶ 131.

Plaintiff first asserts that he suffered gender bias because Roe's "story was deemed more credible from the beginning and given more weight in the final analysis."  Compl. ¶ 131(a).  But the Complaint provides not a single *fact* to support the allegation that Defendants reached any premature conclusions, much less that the reason they did so was gender bias.  To the contrary, the Report discusses at length the evidence relied upon to conclude that Plaintiff knew or should have known that Roe was too intoxicated to give consent.  Ex. C at 26-34.  As detailed above, Roe's account of her significant alcohol consumption and memory loss was corroborated by, among other evidence, Witness 3's detailed statements that Roe was exhibiting "███████ ███████████" when she returned to her suite, and by Plaintiff's own April 2 text to Roe stating she was "█████████," which undermined his later narrative that he had no indication she was too impaired to give consent.  *Supra* at 5, 7-8.  The evidence also showed that Plaintiff understood at the time that Roe did not recall what had happened in her room in the early morning of April 2.  When Roe woke up upset about Plaintiff's presence in her room, Plaintiff did not recount a purportedly consensual sexual encounter, but instead claimed to Roe, both in person and later via text, that "██████" had happened between them.  *Supra* at 5, 7-8.

Indeed, if anything, the Report on its face refutes any inference that the investigator harbored a secret bias in favor of women over men. The investigator *entirely discounted* the testimony of Witness 2, a woman who had also attended the party and gave testimony *against* Plaintiff. Ex. C at 31 n.31. If the investigator were reflexively biased in favor of women, she presumably would have believed Witness 2's account. To infer that the investigator weighed the evidence according to the gender of any of the concerned individuals would be implausible.

Plaintiff also points to a number of other purportedly deficient procedural decisions in the investigation, but he again fails to identify, as he must, any plausible basis for an inference that Harvard acted "*because of* Plaintiff's sex." *Univ. of Mass.-Amherst*, 2015 WL 4306521, at *8 (emphasis in original). Specifically, Plaintiff alleges that:

   a) Harvard did not locate Roe's police report and medical records, Compl. ¶ 131(c);

   b) Harvard did not locate surveillance video of the night in question, *id.*;

   c) Harvard did not credit his arguments that the witnesses were biased and had "tailored their stories" with Roe, *id.* ¶ 131(d);

   d) The Report discussed the impact of the incident on Roe but not on him, *id.* ¶ 131(e); and

   e) The Report did not discuss his level of intoxication, *id.* ¶ 131(b).

Notably absent from those allegations is *any fact having anything to do with gender*. That absence alone suffices to dismiss Plaintiff's claim. But worse yet, the Complaint and Report provide a clear "gender-neutral explanation" for each allegation. *Boston College*, 892 F.3d at 92. To wit:

   a) ODR asked Roe to authorize disclosure of the police and medical records, and she declined. Ex. C at 13 n.20, 24. The investigator therefore did not consider the existence of either source in reaching her conclusions. *Id.*

   b) The Report explains that any video of the route Plaintiff, Witness 1, and Roe traveled to her dorm from the party is automatically overwritten every 28 days, meaning any video was erased on April 30, 2017, in the normal course, just three days after Roe filed her

complaint, and before ODR officially opened the investigation. *Id.* at 4, 14 & n.21. Further, Roe's complaint did not identify the path they traveled to her dorm that night, and ODR therefore "███████████████████████████████████████████████ ████████████████████" the video was erased. *Id.* at 14 & n.21. ODR verified that the video had been erased. *Id.*

    c) As the investigator explained, Plaintiff's assertions of bias against Witness 3 were wholly speculative, and the investigator deemed Witness 3 "████████████████" because she "████████████████████████████████████████████████" and was "████████████████████████████████." *Id.* at 33. And Plaintiff ignores that the investigator *agreed* with Plaintiff that Witness 1 was not credible "█ ████████," which is precisely why the investigator relied primarily on Witness 3's account and Plaintiff's own admission. *See id.* at 34.

    d) The report's discussion of the objective impact on Roe (and not Plaintiff) is not indicative of any error, much less gender bias; rather, it was necessary to explain the Report's conclusion that the incident was "████████████████" to violate the Policy. *Id.* at 33-34.

    e) The Policy provides that an accused student's intoxication "does not . . . diminish the Respondent's responsibility for sexual or gender-based harassment." Ex. A at 5. Even if that provision could be construed as disadvantageous to accused students, following it plainly does not demonstrate, as Plaintiff must, any bias *against men*.

Given those indisputable facts, and "in the absence of any specific factual allegations pointing to [gender] bias on the part of the defendants, it cannot be said that the discriminatory motive explanation is plausible rather than just conceivable" under the standards set forth in *Iqbal*. *Doe v. Rector & Visitors of George Mason Univ.*, 132 F. Supp. 3d 712, 733 (E.D. Va. 2015) (dismissing complaint alleging that gender bias drove erroneous outcome based on conclusory allegations and news reports that federal officials were "aggressively investigating how universities handle sexual assault cases," because the complaint did not "allege any facts suggesting that plaintiff is being singled out as a man to make a point").

At bottom, Plaintiff is dissatisfied with the outcome of Harvard's investigation. But Title IX does not provide Plaintiff a vehicle to relitigate that outcome based simply on his disagreements with Harvard's findings. Title IX "erroneous outcome" claims are a means to redress *gender bias*, and Plaintiff does not and cannot plausibly allege that such bias infected

Harvard's investigation here.  *See Yu v. Vassar Coll.*, 97 F. Supp. 3d 448, 462 (S.D.N.Y. 2015)

("To the extent that Yu simply disagrees with the [disciplinary panel's] decision, the Court

cannot now—absent flawed process *and* gender discrimination—second-guess the panelists'

credibility determinations and factual conclusions.") (emphasis in original).  Numerous courts

have accordingly dismissed similar efforts to transmute a plaintiff's dissatisfaction with his

treatment as the accused party into a claim of gender bias without specific support.  *See, e.g.*,

*Bleiler v. Coll. of Holy Cross*, 2013 WL 4714340, at \*12 (D. Mass. 2013) ("Bleiler's claim of

bias is that the bias is 'toward the rights of reporting complainants,' which is not the same as

alleging bias or discrimination against male students as required for his Title IX claim."); *Doe v.*

*Columbia Coll. Chicago*, 299 F. Supp. 3d 939, 953-57 (N.D. Ill. 2017) (similar dismissal); *Doe*

*v. Purdue Univ.*, 281 F. Supp. 3d 754, 777, 784 (N.D. Ind. 2017) (dismissing claim with

prejudice because "the alleged procedural deficiencies and Plaintiff's disagreement with the

credibility determination cannot be a basis to impute gender bias").

Indeed, Plaintiff's Complaint is remarkably similar to the one dismissed at the Rule

12(b)(6) stage in *Doe v. University of Massachusetts-Amherst*, 2015 WL 4306521 (D. Mass.

2015), which was filed by one of Plaintiff's attorneys.  As Judge Mastroianni explained:

> Plaintiff asserts he received affirmative consent from Jane Doe as to all sexual
> contact and there were no clues in her conduct indicating she was so intoxicated
> as to be unable to give consent.  With respect to the disciplinary proceeding,
> Plaintiff points to difficulties getting information, deficiencies in the
> investigation, limits placed on his ability to cross-examine witnesses, the
> exclusion of some documentary evidence he wished to introduce, and the misuse
> of witness testimony by the hearing board. . . . Taken together, the facts alleged
> by Plaintiff are sufficient to raise at least some questions about the outcome of his
> disciplinary proceeding.  They may even accurately reflect that the University
> treated Jane Doe more favorably than Plaintiff during the disciplinary process, but
> they are insufficient to suggest that the disparate treatment was *because of*
> Plaintiff's sex.

*Id.* at \*8 (quotation omitted).  The same conclusion applies to Plaintiff's allegations here.

Finally, Plaintiff asserts in two conspiratorial (and conclusory) paragraphs that ODR was influenced by "federal officials" to "abrogate the civil rights of men and treat men differently [from] women," and by similar "internal institutional pressure."  Compl. ¶¶ 132-33.  Plaintiff alleges no facts to support such inflammatory allegations, nor to suggest that debate over Harvard's policies had any impact on his case.  Such "general allegations about public pressure to resolve sexual assault complaints are insufficient to show that gender bias was the motivating factor in the erroneous result."  *Columbia Coll.*, 299 F. Supp. 3d at 953-54 (collecting cases). Indeed, the First Circuit in *Boston College* rejected an identical "superficial assertion[] of discrimination" as "both conclusory and meritless."  892 F.3d at 91-93.  The same is true here. Plaintiff's assertions are "unsupported by even minimal data or credible anecdotal references," and are insufficient to state a gender-bias claim.  *Univ. of Mass.-Amherst*, 2015 WL 4306521, at *9.  For all of these reasons, Plaintiff's Title IX claim should be dismissed.

## II.     DEFENDANTS ARE NOT STATE ACTORS UNDER SECTION 1983.

To establish a constitutional due process claim under 42 U.S.C. § 1983, Plaintiff must first establish that Defendants are "state actor[s]."  *Klunder v. Brown Univ.*, 778 F.3d 24, 30 (1st Cir. 2015).  But Harvard is a private university, and Harrington its employee.  Compl. ¶¶ 12, 15. Acts by a private actor may be deemed state action only in rare circumstances, such as "if, with respect to the activity at issue, the private entity is engaged in a traditionally exclusive public function; is 'entwined' with the government; is subject to governmental coercion or encouragement; or is willingly engaged in joint action with the government."  *Logiodice v. Trs. of Maine Cent. Inst.*, 296 F.3d 22, 26 (1st Cir. 2002).  Although the Complaint appears to invoke each of these theories, there is, as the Sixth Circuit recently observed, not "a single case in which a court has determined that a private school's compliance with Title IX's regulations make that entity a state actor for purposes of a Fourteenth Amendment Due Process claim."  *Faparusi v.*

*Case Western Reserve Univ.*, 711 F. App'x 269, 276 (6th Cir. 2017).  That is because "[f]ederal regulation and receipt of federal funds" do not "convert private conduct to government or state action," and, absent "evidence that the federal government participated in the proceedings against the plaintiff, or dictated the specific finding of responsibility in [a] case," there is no basis to attribute a private school's actions to the state.  *Id.* (quotations omitted); *see also Heineke v. Santa Clara Univ.*, 2017 WL 6026248, at \*16-17 (N.D. Cal. 2017) (collecting cases).

The First Circuit has similarly held that a private high school in Maine was not a state actor with respect to disciplinary action, despite the school's receipt of funding and compliance with numerous state regulations, because the school was run by private trustees, not public officials, who had "the sole right to promulgate, administer and enforce" rules related to school discipline.  *Logiodice*, 296 F.3d at 28.  The same is true of Harvard.  Contrary to Plaintiff's conclusory assertions, *e.g.*, Compl. ¶ 138, federal officials played no role in developing the Policy and Procedures or in conducting this investigation.  *See* Ex. A at 2; *see also Curto v. Smith*, 248 F. Supp. 2d 132, 139-40 (N.D.N.Y. 2003) (no state action where creation and enforcement of policies were "entirely committed to the discretion of the private institution").[5]

The suggestion that Harrington, Harvard's employee, is a "state actor" thus necessarily fails as well.  The Complaint alleges no particular facts suggesting that Harrington's individual actions are properly attributed to the state.  *See, e.g.*, *Lu v. Dalton*, 2016 WL 3976574, at \*2 (D.

---

[5] Plaintiff's allegation (Compl. ¶¶ 29–30) that the federal government coerced Harvard into complying with Title IX through the 2011 "Dear Colleague Letter" ("DCL") ignores that the DCL was never binding and was rescinded before this investigation in any event.  Letter from Russlynn Ali, Assistant Secretary for Civil Rights, U.S. Dep't of Educ. 1 n.1 (Apr. 4, 2011), https://www2.ed.gov/about/offices/list/ocr/letters/colleague-201104.pdf; Letter from Candice Jackson, Acting Assistant Secretary for Civil Rights, U.S. Dep't of Educ. 1 (Sept. 22, 2017), https://www2.ed.gov/about/offices/list/ocr/letters/colleague-title-ix-201709.pdf.  Further, the proposition that Harvard would be engaging in state action merely by complying with an agency opinion letter is plainly "untenable" because it would "'convert every [private entity] into a governmental actor every time it complies with a presumptively valid, generally applicable law.'"  *Doe v. Univ. of Denver*, 2018 WL 1304530, at \*5-6 (D. Colo. 2018) (quoting *Sutton v. Providence St. Joseph Med. Ctr.*, 192 F.3d 826, 838-39 (9th Cir. 1999)).

Mass. July 22, 2016) ("Tufts is a private university, and the actions of its employees do not fall within the scope of state action necessary for a claim under 42 U.S.C. § 1983.").

## III.     PLAINTIFF'S CONTRACT CLAIMS SHOULD BE DISMISSED.

Under Massachusetts law, "the relationship between a student and a university is based on contract," here the Policy and Procedures. *W. New England*, 228 F. Supp. 3d at 169.  The meaning of the contract "is generally a question of law" for the court, and is judged by "the standard of reasonable expectation," *i.e.*, the "meaning [the university] should reasonably expect the [student] to give" the contract. *Id.* (quotations omitted).

Plaintiff has two breach of contract theories, each meritless.  First, Plaintiff claims Harvard breached by denying his and Roe's requests for informal resolution, and doing so with "little to no explanation."  Compl. ¶¶ 149-51.  But informal resolution rests squarely within the discretion of the ODR Director, in consultation with other Harvard officials.  Ex. B at 7.  Those administrators "assess the severity of the alleged harassment and the risk of a hostile environment for others in the community to determine whether an informal resolution may be appropriate."  *Id.* at 1.  Plaintiff acknowledges that the informal resolution request was denied on precisely such grounds, *i.e.*, due to the "severity of the allegations and the potential for the creation of a hostile environment for others in the community."  Compl. ¶ 80.  Plaintiff identifies no provision that would convey a reasonable expectation that Harvard is obligated to grant any particular request, much less to provide any further explanation of its reasons when it denies a request.  *See id.*  Harvard therefore did not breach any contractual obligation by denying the requests.  *See Boston College*, 892 F.3d at 81 ("Since there is no threshold evaluation requirement, B.C. could not have breached its contract."); *Doe v. Brandeis*, 177 F. Supp. 3d 561, 594 (D. Mass. 2016) ("Because the Handbook does not mandate the creation of any such statement, it would be unreasonable for a student to expect one to be provided to him as of

- 16 -

right."); *Bleiler*, 2013 WL 4714340, at *16 (similar dismissal).[6]

Second, Plaintiff contends that Harvard never contacted him "for a second interview" before the end of the investigation and therefore breached the Procedures' requirement that "[a]fter the collection of additional information is complete but prior to the conclusion of the investigation, the Investigator will request individual follow-up interviews with the Complainant and the Respondent to give each the opportunity to respond to the additional information." Compl. ¶¶ 152-54.  But as already explained, Plaintiff *declined* the "first" post-response interview offered to him, Ex. C at 6, and he *did receive* a second interview request, which he accepted.  *Id.* at 6-7.  During that interview, the investigator "read aloud her notes summarizing the interviews she had conducted over the course of the investigation."  Compl. ¶ 76.  Although Plaintiff declined to respond to that evidence during the interview, Ex. C at 6-7, he later submitted lengthy letters in response, as well as a response to the investigator's draft report, all of which ODR considered prior to finalizing its report.  *Id.* at 6.[7]

Plaintiff also brings a claim for breach of the duty of good faith and fair dealing, which "concerns the manner of performance" of contractual duties.  *W. New England*, 228 F. Supp. 3d at 180.  That duty is "circumscribed by the obligations in the contract," and is breached only "when one party violates the reasonable expectations of the other."  *Id.*  Here, Plaintiff merely restates in the garb of "bad faith" his theories about the conduct and outcome of the investigation—such as that Harvard presumed his liability and failed to find yet unidentified exculpatory evidence.  Compl. ¶ 159(a), (c).  He provides no additional allegations suggesting

---

[6] Plaintiff's assertion that Harvard's stated reason for denying the requests was pretextual is addressed *infra* at 19 n.8, in the context of his racial discrimination claim.

[7] Plaintiff also refers to his inability to respond to Roe's October 17, 2017 comments on his response to the draft report.  Compl. ¶ 89.  But nothing in the Procedures afforded him such an opportunity, *see* Ex. A at 17—so there was no breach—and Roe's comments did not contain any new material evidence, and certainly did not alter the outcome of the report ODR issued the next day, Ex. C at 26-33—so there is no damage.

bad faith in the investigation, and the claim therefore fails for the reasons given in addressing his

Title IX and contractual breach claims.  Plaintiff also alleges that Harvard acted in bad faith by

denying his request for informal resolution, but again offers no elucidation apart from his own

suggestion that "such requests [are] generally permitted by the Policy."  *Id.* ¶ 159(b).  As

explained above, informal resolution is expressly conditioned on Harvard's approval, Ex. B at 1,

7, so Plaintiff could have had no reasonable expectation that the request would be rubber

stamped.  The bare fact that Harvard denied the request does not give rise to any inference of bad

faith.  *Cf. W. New England*, 288 F.Supp. 3d at 154 ("bare averments of motive" are "not

sufficient to survive a motion to dismiss").

## IV.    PLAINTIFF FAILS TO STATE A RACIAL DISCRIMINATION CLAIM.

Plaintiff alleges that all Defendants violated 42 U.S.C. § 1981, which bars "racially

motivated and purposefully discriminatory acts," *Yusuf v. Vassar College*, 35 F.3d 709, 714 (2d

Cir. 1994), by denying his and Roe's informal resolution requests (both Plaintiff and Roe are

African-American).  Compl. ¶¶ 163-76.  At the outset, Plaintiff's claim against Harrington must

be dismissed for the simple reason that she played no role in denying those requests.  *See* Ex. C

at 7 (explaining that the requests were denied by "the Director of ODR" in consultation with "the

Title IX Officer and the College").

As to Harvard, Plaintiff must show that Harvard "intentionally discriminated against

[him] on the basis of race" by denying the requests.  *Doe v. Amherst Coll.*, 238 F. Supp. 3d 195,

224 (D. Mass. 2017).  But the Complaint's only allegation on that central issue is the following:

"Upon information and belief, informal resolution has been permitted by [Harvard] in similar

actions involving sexual misconduct where the parties were Caucasian."  Compl. ¶ 173.  As in a

case dismissing a similar claim, "while the Complaint baldly alleges that African Americans

have been subjected to [different treatment] than Caucasians have, it fails to allege any facts in

support of that conclusory allegation, much less any facts that would 'raise a reasonable expectation that discovery will reveal evidence' of such disparate treatment." *Doe v. The Trs. of the Univ. of Penn.*, 270 F. Supp. 3d 799, 830 (E.D. Pa. 2017) (quoting *Phillips v. Cty. of Allegheny*, 515 F.3d 224, 234 (3d Cir. 2008)); *see also Amherst*, 238 F. Supp. 3d at 224 (dismissing Section 1981 claim where plaintiff failed to allege with particularity that Caucasian students found responsible for similar violations received lesser punishments); *Yusuf*, 35 F.3d at 713 (similar dismissal); *Odom v. Columbia Univ.*, 906 F. Supp. 188, 194 (S.D.N.Y. 1995) (similar dismissal).

Plaintiff's pure speculation that similarly situated Caucasian students, whose cases presented similar facts, have been accorded informal resolution is not only plainly insufficient under *Iqbal*, but, given the inherently case-by-case nature of sexual assault allegations, facially implausible.  Indeed, Plaintiff's conclusory assertion of racial animus is particularly implausible in the context of this case, where Roe, the complainant, was also African-American; Plaintiff surely does not believe Harvard administrators had some unstated animus against Roe.  *Cf. Lynam v. Bishop State Cmty. Coll.*, 2016 WL 6574340, at *9 (S.D. Ala. Nov. 4, 2016) (preference for another candidate of same race as plaintiff "clearly does not show racial bias or discriminatory intent").[8]

---

[8] Plaintiff also alleges that Harvard's stated reason for denying the informal resolution request was pretextual. Compl. ¶ 107.  Harvard cited the "severity of the alleged harassment and the potential risk of a hostile environment for others in the community," which Plaintiff calls "tenuous at best" because Harvard did not impose interim measures while the investigation proceeded. *Id.* ¶¶ 169-71.  Plaintiff was accused of sexually assaulting another student while she was incapacitated; regardless whether the particular circumstances required interim safety measures (which are not considered disciplinary measures), such activity was plainly serious and implicated Harvard's interest in, among other things, protecting the student body.  And even if Plaintiff had offered some reason to doubt Harvard's stated rationale for the denial, the Complaint lacks allegations bridging the gap to the conclusion that *racial animus* was the actual reason.  Nor could he have plausibly made such allegations when, again, the student whose complaint Harvard investigated and validated was herself African-American.

**V.      PLAINTIFF'S NEGLIGENCE CLAIM FAILS AS A MATTER OF LAW.**

Finally, Plaintiff's negligence claim against all Defendants is foreclosed by binding First

Circuit authority.  Plaintiff bears the burden of showing Defendants owed him a duty of care, that

they breached that duty, and that the breach caused him damage.  *Saldivar v. Racine*, 818 F.3d

14, 20-21 (1st Cir. 2016) (applying Massachusetts law).  "Whether or not a duty of care existed

is a question of law for the court."  *Gorfinkle v. U.S. Airways, Inc.*, 431 F.3d 19, 23 (1st Cir.

2005) (citing *O'Sullivan v. Shaw*, 431 Mass. 201 (2000)).  Plaintiff's claim fails at that first step.

Plaintiff asserts Harvard and Harrington owed "a duty to him to conduct the disciplinary

process with due care."  Compl. ¶ 180.  The First Circuit rejected an identical argument in

*Boston College*.  There, the student similarly alleged that once Boston College placed him under

its disciplinary process, it owed him "an independent duty to conduct such disciplinary process

with due care."  *Boston College*, 892 F.3d at 94.  But the court held that because the school's

policy and procedure gave rise "to a contractual relationship" and "prescribe[d] the disciplinary

process," any "remedy for a breach of this contractual obligation must sound in contract, not in

tort."  *Id.*  Put otherwise, the court held that "B.C. did not owe the Does any additional

independent duty outside of their existing contractual relationship."  *Id.*  The First Circuit applied

that analysis equally to the individual defendants who conducted the investigation.  *Id.* at 95; *see

also Doe v. Emerson Coll.*, 153 F. Supp. 3d 506, 515 (D. Mass. 2015) ("Massachusetts does not

. . . impose a common-law or statutory duty on administrators to enforce university policies.");

*Amherst*, 238 F. Supp. 3d at 228.

The same analysis applies here, leading to the same conclusion.  None of the Defendants

owed any independent tort duty to Plaintiff, and the negligence claim fails as a matter of law.

## CONCLUSION

For the foregoing reasons, the Complaint should be dismissed with prejudice.

Dated:  January 4, 2019                          Respectfully submitted,


                                        */s/ Apalla U. Chopra*
                                        Apalla U. Chopra (*pro hac vice*)
                                        achopra@omm.com
                                        O'MELVENY & MYERS LLP
                                        400 South Hope Street
                                        Los Angeles, California  90071
                                        Telephone:     (213) 430-6000
                                        Facsimile:     (213) 430-6407

                                        Patrick D. McKegeny (*pro hac vice*)
                                        pmckegney@omm.com
                                        O'MELVENY & MYERS LLP
                                        7 Times Square
                                        New York, NY 10036
                                        Telephone:     (212) 326-2000
                                        Facsimile:     (212) 326-2061

                                        Bradley N. Garcia (*pro hac vice*)
                                        bgarcia@omm.com
                                        O'MELVENY & MYERS LLP
                                        1625 Eye Street, NW
                                        Washington, DC 20006
                                        Telephone:     (202) 383-5300
                                        Facsimile:     (202) 383-5414

                                        Victoria L. Steinberg, BBO #666482
                                        Joseph M. Cacace, BBO #672298
                                        TODD & WELD LLP
                                        One Federal Street
                                        Boston, MA  02110
                                        Telephone:     (617) 624-4714
                                        Facsimile:     (617) 624-4814
                                        vsteinberg@toddweld.com
                                        jcacace@toddweld.com

                                        *Attorneys for Defendants,*
                                        *Harvard University, President and Fellows of*
                                        *Harvard College, and Brigid Harrington*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that this document filed through the ECF system will be sent

electronically to the registered participants as identified on the Notice of Electronic Filing (NEF)

and paper copies will be sent to those indicated as non-registered participants on January 4,

2019.

*/s/ Apalla U. Chopra*
Apalla U. Chopra (*pro hac vice*)
