UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

JOHN DOE,                                      *
                                               *
            Plaintiff,                         *
                                               *
      v.                                       *        Civil Action No. 1:18-cv-12150-IT
                                               *
HARVARD UNIVERSITY, et al.,                    *
                                               *
            Defendants.                        *

MEMORANDUM & ORDER

May 28, 2020

TALWANI, D.J.

       Plaintiff, a Harvard College student, was disciplined for an alleged sexual assault

following an internal investigation. Proceeding as John Doe, he brings this action seeking

damages and injunctive relief against Harvard University and the President and Fellows of

Harvard College (collectively, Harvard) and the investigator, Brigid Harrington. Plaintiff asserts

six claims: Violation of Title IX, 20 U.S.C. § 1681, et seq., against Harvard (Claim 1); Denial of

Due Process in violation of the Fourteenth Amendment, brought under 42 U.S.C. § 1983, against

Harvard and Harrington (Claim 2); Breach of Contract against Harvard (Claim 3); Breach of the

Covenant of Good Faith and Fair Dealing against Harvard (Claim 4); Violation of 42 U.S.C.

§ 1981 via racial discrimination, against Harvard and Harrington (Claim 5); and Negligence

against Harvard and Harrington (Claim 6). Defendants' pending Motion to Dismiss the

Complaint [#27] seeks dismissal of all claims.

       For the following reasons, the Motion to Dismiss the Complaint [#27] is DENIED as to

the breach of contract, breach of the covenant of good faith and fair dealing, and § 1981 claims

against Harvard, and is GRANTED as to the remaining claims against Harvard and as to all

claims against Harrington.

I.      Factual Background

    A.   Policies and Procedures at Issue

       1.   Title IX and the "Dear Colleague Letter"

In 2011, the Office for Civil Rights of the United States Department of Education issued

a guidance letter, known as the "Dear Colleague Letter," to colleges and universities in the

United States. Compl. ¶ 34 [#9]. The Dear Colleague Letter advised recipients of federal funds

that sexual violence constituted sexual harassment within the meaning of Title IX and its

regulations, and directed schools to "take immediate action to eliminate the harassment, prevent

its recurrence, and address its effects." Id. ¶ 35.[1]

       2.   Harvard's Policies

In response to the Dear Colleague Letter, Harvard hired its first Title IX coordinator in

early 2013 and substantially revised its policy (the "University Policy") for addressing sexual

harassment in 2014, creating the Office of Sexual and Gender-Based Dispute Resolution

("ODR") and establishing procedures, including a preponderance of the evidence standard, for

Title IX investigations. Id. ¶¶ 36-38; see also Harvard University Procedures for Handling

Complaints Involving Students Pursuant to Sexual and Gender-Based Harassment Policy, dated

April 5, 2017 ("University Procedures") [#29-2].

Harvard's Faculty of Arts and Sciences ("FAS") also adopted a Sexual and Gender-Based

---

[1] On September 22, 2017, the Office for Civil Rights rescinded the Dear Colleague Letter and
put in place an interim guidance. Compl. ¶ 40 [#9]. The interim guidance requires that the
standard used for evaluating claims of sexual misconduct be the same as that applied in other
student disciplinary proceedings, and that "[a]ny rights or opportunities that a school makes
available to one party during the investigation should be made available to the other party on
equal terms." Id. ¶ 41.

Harassment Policy and Procedures for the Faculty of Arts and Sciences (the "FAS Policy"). <u>See</u> FAS Policy, dated January 13, 2016 [#29-1]. The FAS Policy explains that the University Policy applied to FAS, that the University Procedures governed allegations of sexual harassment involving Harvard students, and that FAS "is responsible for elaborating on and supplementing them to suit [FAS's] needs and goals." <u>Id.</u> at 2-3.

The FAS Policy begins with a Policy Statement stating that Harvard is "committed to fostering an open and supportive community" and that the commitment "includes maintaining a safe and healthy educational and work environment in which no member of the community is excluded from participation in, denied the benefits of, or subjected to discrimination in any University program or activity on the basis of sex, sexual orientation, or gender identity." Compl. ¶ 26 [#9] (quoting the FAS Policy at 1). The Policy Statement states further that "sexual harassment, including sexual violence, are forms of sex discrimination in that they deny or limit an individual's ability to participate in or benefit from University programs or activities." FAS Policy at 3 [#29-1]. It continues that it is the policy of the University "to provide prompt and equitable methods of investigation to stop discrimination, remedy any harm, and prevent its recurrence," and warns that "[v]iolations of this Policy may result in the imposition of sanctions up to, and including, termination, dismissal, or expulsion, as determined by the appropriate officials at the School or unit." <u>Id.</u>

The FAS Policy defines "sexual harassment" to include a "hostile environment," that is, "unwelcome conduct of a sexual nature . . . sufficiently severe, persistent, or pervasive that it interferes with or limits" a student's education. <u>Id.</u> at 4. Under the FAS Policy, "[a] hostile environment can be created by persistent or pervasive conduct or by a single severe episode." <u>Id.</u>

3

Sexual violence, including sexual assault and dating violence, is a form of sexual harassment under the policy. Id. Conduct is "unwelcome if a person (1) did not request or invite it and (2) regarded the unrequested or uninvited conduct as undesirable or offensive." Id. at 5. Further, "when a person is so impaired or incapacitated as to be incapable of requesting or inviting the conduct, conduct of a sexual nature is deemed unwelcome, provided that the Respondent knew or reasonably should have known of the person's impairment or incapacity." Id. "The person may be impaired or incapacitated as a result of drugs or alcohol or for some other reason, such as sleep or unconsciousness." Id. "A Respondent's impairment at the time of the incident as a result of drugs or alcohol does not . . . diminish the Respondent's responsibility for sexual or gender-based harassment under this Policy." Id.

The FAS Policy includes procedures Harvard would employ if it received a complaint alleging violations of the policy. Compl. ¶ 25 [#9]. Upon receipt of a complaint, Harvard's Title IX Officer assigns an ODR investigator to conduct an initial review. Id. ¶ 27; FAS Policy at 14-15 [#29-1]. The investigator decides whether the information, if assumed to be true, would constitute a violation of the FAS Policy, and if so, the investigator initiates an investigation. Compl. ¶ 27 [#9]; FAS Policy at 15 [#29-1].

During the investigation, the investigator conducts interviews with the complainant, the respondent, and any witnesses. Compl. ¶ 28 [#9]. At the end of the investigation, the investigator "make[s] findings of fact, applying a preponderance of the evidence standard, and determine[s] based on those findings of fact whether there was a violation of the Policy." Id. ¶ 29 (quoting the FAS Policy at 17).

Parties may "request informal resolution as an alternative to formal resolution of the

4

complaint." Id. ¶ 31 (quoting the FAS Policy at 18). However, informal resolution requires "agreement of the Complainant and the Respondent and the approval of the Title IX Officer in consultation with the FAS Title IX Coordinator for Faculty and the Title IX Coordinator for the School or unit with which the Complainant is affiliated." Id. (quoting the FAS Policy at 18).

The parties may appeal an investigator's decision alleging either "1. A procedural error occurred, which may change the outcome of the decision; or, 2. The appellant has substantive and relevant new information that was not available at the time of the investigation and that may change the outcome of the decision." Id. ¶ 32 (quoting the FAS Policy at 18).

When an investigator concludes that the policy has been violated, sanctions may be imposed. Id. ¶ 33. "Sanctions shall take into account the severity and impact of the conduct, the Respondent's previous disciplinary history (based on consultations with the relevant Ad Board representative), any written statements submitted by the parties relevant to sanctions, and the goals of this Policy." Id. (quoting the FAS Policy at 21). The Policy does not specify minimum or maximum sanctions but states that a "severe violation will ordinarily require that the respondent observe some period of absence from the University." Id. (quoting the FAS Policy at 22).

Harvard provided Plaintiff a copy of school policies, including the FAS Policy at issue here, upon his acceptance into the incoming freshman class. Id. ¶ 25.

B.  The Alleged Assault

Plaintiff entered Harvard as a freshman in the fall of 2016. Id. ¶¶ 23-24.

On April 1, 2017, Plaintiff attended a party along with a Harvard sophomore, referred to in this matter as Jane Roe, and six other members of their acapella group, including Witness 1.

Id. ¶¶ 57, 60. Both Plaintiff and Jane Roe consumed alcohol at the party and participated in drinking games. Id. ¶ 58. Plaintiff and Jane Roe engaged in various consensual sexual acts during the party. Id. ¶ 59. At the end of the party, Plaintiff and Witness 1 agreed to help Jane Roe carry equipment back to Jane Roe's dorm room at Mather House. Id. ¶ 60. Jane Roe made the walk including walking up seven steps, past a security guard, and then walking up three flights of stairs, without trouble or assistance. Id. Jane Roe realized that she did not have her keys and called her roommate to let her into their suite. Id. ¶ 61. Plaintiff, Jane Roe, and Witness 1 entered the suite, and went to Jane Roe's bedroom, where Jane Roe immediately lay down on her bed. Id. ¶¶ 62-63. Jane Roe asked Witness 1 and Plaintiff to stay there until she fell asleep and Jane Roe separately whispered to Plaintiff and "explicitly invited him to stay in the room." Id. ¶¶ 63-64. Witness 1 left the room, and Plaintiff stayed. Id. ¶ 65. Plaintiff and Jane Roe then engaged in sexual acts, where Jane Roe was an active and willing participant in the activity. Id. ¶ 66.

The next morning, on April 2, 2017, the two woke up in bed together. Id. ¶ 67. Jane Roe left to go to the rest room, and on her return, asked Plaintiff in an angry tone why he was in her bed. Id. ¶ 68. Plaintiff stated he was not sure, but that he must have fallen asleep in the bed the night before. Id. ¶ 69. When Jane Roe asked what happened between them, Plaintiff replied, "Nothing." Id.

Later that day, Jane Roe texted Plaintiff asking whether or not they had "hooked up" and expressing concern that she had cheated on her boyfriend. Id. ¶ 70. Plaintiff again responded that "nothing happened." Id. Plaintiff met with Jane Roe on April 3, 2017, and Plaintiff indicated that, on the night of April 1 and 2, he had performed sexual acts on her, but that they had not had intercourse. Id. ¶ 71. Plaintiff maintained that the sexual interactions were consensual and that

both parties were active participants. Id.

At some point thereafter, Jane Roe's boyfriend threatened Plaintiff with physical violence and assured Plaintiff that the boyfriend would report Plaintiff to the University with the intent of getting him kicked out of school. Id. ¶ 90.

C.    The Investigation

Jane Roe filed a complaint with ODR on April 27, 2017, alleging that Plaintiff sexually assaulted her on April 1, 2017, while she was intoxicated. Id. ¶ 72. On May 5, 2017, Plaintiff received a letter from Harvard's Title IX investigator Brigid Harrington notifying him that he was the subject of an investigation. Id. ¶ 73. Plaintiff submitted a written response to the allegations on May 23, 2017. Id. ¶ 74. He did not receive a signed and dated copy of the initial complaint until the end of June 2017. Id. Defendants asked Plaintiff to participate in an investigatory phone interview during the summer of 2017, but Plaintiff, who was abroad at the time, requested the interview be conducted when he returned to campus in the fall. Id. ¶ 75. Harrington declined his request and Plaintiff was interviewed over the phone on August 16, 2017. Id. ¶¶ 75-76. Harrington read notes from the interviews she had conducted over the course of the investigation and Plaintiff read a prepared statement. Id. ¶ 76. Harrington asked Plaintiff questions based on witness interviews conducted previously and Plaintiff declined to answer on advice of counsel. Id. Plaintiff was not provided ODR's notes from his phone interview. Id. ¶ 77.

In August 2017, Jane Roe initiated a discussion with Plaintiff, through her advisor, about resolving the matter informally. Id. ¶ 78. Plaintiff agreed and Jane Roe submitted a request for informal resolution on behalf of both parties to ODR. Id. ¶¶ 79-80. ODR denied the request, stating that denial of the request was based on the severity of the alleged harassment and the

potential risk for others in the Harvard community. Id. ¶ 80. Plaintiff requested reconsideration of the decision and the request was denied. Id. ¶ 80.

Harvard did not take any measures to keep Plaintiff away from campus. Id. ¶ 81. ODR provided Jane Roe and Plaintiff with a draft of the investigation report on September 25, 2017. Id. ¶ 82.

D.      The ODR Investigator's Final Report and Plaintiff's Appeal

On October 18, 2017, the investigator released the Final Report of Investigation ("Final Report"), concluding that it was "more likely than not" that Plaintiff had engaged in "conduct of a sexual nature, occurring when [Jane Roe] was incapable of requesting or inviting the conduct, and was sufficiently severe that it interfered with or limited [her] ability to participate in or benefit from education or work programs or activities." Id. ¶ 110 (quoting Final Report at 7).

Plaintiff appealed the Final Report on October 25, 2017, stating that the findings were based on procedural error and maintaining that he had not in fact violated the FAS Policy. Id. ¶ 111. The Appellate Panel reviewed the case and affirmed the original finding of responsibility. Id. ¶ 112.

E.      Discipline Imposed and Plaintiff's Appeal

On November 7, 2017, the Administrative Board imposed sanctions on Plaintiff requiring that he withdraw from Harvard for four semesters. Id. ¶ 113. Plaintiff appealed the sanctions on November 28, 2017, and the Dean of the College denied the appeal on December 19, 2017. Id. ¶¶ 114-115. Plaintiff requested reconsideration on January 8, 2018, which was denied on January 25, 2018. Id. ¶¶ 116-117.

II.     Standard of Review

8

A party moving to dismiss an action pursuant to Rule 12(b)(6) has the burden of demonstrating the complaint lacks "sufficient factual matter" to state a claim for relief that is actionable as a matter of law and "plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). "Plausibility does not demand a showing that the claim is likely to succeed. It does, however, demand a showing of 'more than a sheer possibility' of success." Butler v. Balolia, 736 F.3d 609, 616 (1st Cir. 2013) (quoting Iqbal, 556 U.S. at 678). The court must accept all well-pleaded facts as true and draw all reasonable inferences in favor of the non-movant. Starr Surplus Lines Ins. Co. v. Mountaire Farms Inc., 920 F.3d 111, 114 (1st Cir. 2019). The moving party must show that the other party's assertions fall short of establishing "each material element necessary to sustain recovery under some actionable legal theory." Centro Medico del Turabo, Inc. v. Feliciano de Melecio, 406 F.3d 1, 6, (1st Cir. 2005) (quoting Berner v. Delahanty, 129 F.3d 20, 25 (1st Cir. 1997)).

If materials outside the complaint are considered, the motion ordinarily "must be decided under the more stringent standards applicable to a Rule 56 motion for summary judgment." Trans-Spec Truck Serv., Inc. v. Caterpillar Inc., 524 F.3d 315, 321 (1st Cir. 2008). Courts have made narrow exceptions "for documents the authenticity of which is not disputed by the parties; for official public records; for documents central to plaintiffs' claim; or for documents sufficiently referred to in the complaint." Watterson v. Page, 987 F.2d 1, 3 (1st Cir. 1993); see also Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322 (2007) (stating a court may consider "documents incorporated into the complaint by reference, and matters of which a court may take judicial notice"). As another district court has summarized, "[t]he exception is often invoked in cases where the parties' dispute is premised on a particular contract or agreement."

Doe v. Trs. of Dartmouth Coll., 2018 WL 2048384, at *1 (D.N.H. May 2, 2018) (citing Beddall v. State St. Bank & Tr. Co., 137 F.3d 12, 17 (1st Cir. 1998) (considering trust agreement) and Julius v. Wells Fargo Bank, N.A., 2017 WL 1592379, at *2 n.5 (D.N.H. Apr. 28, 2017) (considering mortgage agreement and note)). In such cases, "the court's inquiry into the viability of [the] allegations should not be hamstrung simply because the plaintiff fails to append to the complaint the very document upon which by her own admission the allegations rest." Beddall, 137 F.3d at 17. That a complaint mentions a document, or even repeatedly refers to the document, is not enough, however, if that document is not integral to the claim or explicitly relied upon as a basis for liability.

Here, the court has considered the FAS Policy and the University Procedures submitted by Defendants as they are central to Plaintiff's contract claims and their authenticity is not in dispute. FAS Policy [#29-1]; University Procedures [#29-2]. The court declines to consider the Final Report proffered by Defendants for the truth of the statements set forth therein, for although Plaintiff has referenced the Final Report, it is generally because he disagrees with its conclusions, and not because he has adopted the university's investigatory findings. See Trs. of Dartmouth Coll., 2018 WL 2048384, at *1 (granting a motion to strike investigatory report, attached as an exhibit to motion to dismiss, because the document was not submitted to clarify the content of the document referenced in the complaint, but to challenge or supplement plaintiff's allegations).[2]

III.   Discussion

---

[2] However, the court does consider the Final Report for the limited purpose of determining whether Plaintiff's citations to the Final Report in the complaint conflict with the actual text of the document. See infra n.3.

A.   Claim 1 – Erroneous Outcome in Violation of Title IX

Title IX states that "[n]o person in the United States shall, on the basis of sex, . . . be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). The provision is enforceable through an implied cause of action against a recipient of federal funds. Cannon v. Univ. of Chicago, 441 U.S. 677, 717 (1979).

Plaintiff alleges that Harvard, a recipient of federal funds, violated Title IX through its erroneous findings and decision to impose discipline where he was innocent of the charges and where gender bias was a motivating factor behind the erroneous findings and the decision to impose discipline. A plaintiff making such an "erroneous outcome" claim under Title IX must allege 1) "particular facts sufficient to cast some articulable doubt on the accuracy of the outcome of the disciplinary proceeding," and 2) "particularized allegation[s] relating to the causal connection between the flawed outcome and gender bias." Yusuf v. Vassar Coll., 35 F.3d 709, 715 (2d Cir. 1994); see Doe v. Trs. of Boston Coll., 892 F.3d 67, 90 (1st Cir. 2018) (citing the standard used in Yusuf, as modified for purposes of summary judgment, without adopting the standard).

The pleading burden as to the first prong "is not heavy." Yusuf, 35 F.3d at 715. For example, a complaint may allege "particular evidentiary weaknesses behind the finding of an offense such as a motive to lie on the part of a complainant or witnesses, particularized strengths of the defense, or other reason to doubt the veracity of the charge." Id. A complaint may also allege "particular procedural flaws affecting the proof." Id. Here, Plaintiff alleges that he was innocent of the charge because Jane Roe was an active and voluntary participant in the conduct,

and that Jane Roe had a motivation to file a complaint because of her concern that she had cheated on her boyfriend, who threatened Plaintiff that he would report Plaintiff to the University with the intent of getting him kicked out of school.

Plaintiff also raises numerous alleged procedural flaws, including 1) Jane Roe's claim was deemed more credible and given more weight than Plaintiff's version of events, despite the availability of evidence refuting her claims and despite inconsistencies in her accounts, Compl. ¶ 131(a) [#9][3]; 2) the investigator inquired into Jane Roe's level of intoxication without making a similar level of inquiry into Plaintiff's level of intoxication; 3) the investigator repeatedly ignored Plaintiff's claims, statements, and requests for further investigation in available evidence; 4) Defendants failed to take seriously or follow up on allegations of witness bias; and 5) the final report only included discussion of the impact of the incident on Jane Roe, and not on Plaintiff. Compl. ¶¶ 96-102, 131 (a-e) [#9]. The court finds that the complaint meets Plaintiff's pleading burden as to the first prong of his erroneous outcome claim.

The second prong poses a more difficult hurdle. Plaintiff highlights the procedural allegations listed above and argues that they sufficiently allege gender bias. Pl's Opp'n to Mot. to Dismiss 13 [#34] (citing Doe v. Columbia Univ., 831 F.3d 46, 57 (2d Cir. 2016)). In Columbia Univ., the Second Circuit concluded that the burden shifting framework applicable to discrimination cases under Title VII, where an "allegation of facts supporting a minimal plausible inference of discriminatory intent suffices [at the pleading stage] as to this element of

---

[3] Plaintiff asserts further that Harrington, the ODR investigator, acknowledged inconsistencies in Jane Roe's story. Pl's Opp'n to Mot. to Dismiss 5-6 [#34] (citing Final Report at 31). However, Harrington acknowledged inconsistencies only as to Jane Roe's account of the party. Final Report at 31 [#67].

the claim because this entitles the plaintiff to the temporary presumption of McDonnell Douglas until the defendant furnishes its asserted reasons for the action against the plaintiff," applies to Title IX claims. 831 F.3d at 55 (citing McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973)). The court explained further that "[w]hen the evidence substantially favors one party's version of a disputed matter, but an evaluator forms a conclusion in favor of the other side (without an apparent reason based in the evidence), it is plausible to infer (although by no means necessarily correct) that the evaluator has been influenced by bias." Id. at 57. The court acknowledged that while such allegations "support the inference of bias, they do not necessarily relate to bias on account of sex." Id. The court then proceeded to review additional allegations in the complaint to determine if they plausibly supported a bias with respect to sex. Id. (finding allegations asserting that public criticism of university's treatment of female students alleging sexual assault, and resultant university-wide meeting with the Dean to discuss this criticism, allowed for inference that university's actions were motivated by gender bias). Assuming this analysis will be adopted by the First Circuit,[4] Plaintiff has not met this standard.

Accepting Plaintiff's allegations as true and drawing all inferences in his favor, the complaint does not include assertions that "substantially favors" Plaintiff's version of events. According to the complaint, Jane Roe had been drinking the night in question, both socially and while participating in drinking games. Compl. ¶ 58 [#9]. Plaintiff stayed in Jane Roe's dorm room at her request, and she was an active and willing participant in sexual conduct. Id. ¶ 66. In

---

[4] The First Circuit has not taken a position on whether "'the temporary presumption afforded to plaintiffs in employment discrimination cases under Title VII applies to sex discrimination plaintiffs under Title IX as well.'" Haidak v. Univ. of Massachusetts-Amherst, 933 F.3d 56, n.11 (1st Cir. 2019) (quoting Doe v. Trs. of Boston Coll., 892 F.3d 67, 90 n.13 (1st Cir. 2018)).

the morning, however, Jane Roe asked Plaintiff what had happened between them the night before and expressed concern about cheating on her boyfriend. Id. ¶¶ 68, 70. A fact-finder crediting these allegations could conclude, as Plaintiff contends, that there was no unwelcome conduct and Jane Roe was lying about not recalling what had happened the night before. But a fact-finder could also credit these same allegations and conclude that regardless of whether Jane Roe recalled the events, she was "impaired" as a result of alcohol and that, since Plaintiff knew she had been drinking, the sexual contact was unwelcome as defined in the FAS Policy, even if she appeared to be a willing participant in the sexual conduct.

Plaintiff's additional allegations also fail to meet the standard articulated in Columbia Univ. Plaintiff alleges that the investigation proceeded on the presumption that Plaintiff was guilty of the misconduct alleged, with Harrington failing to pursue potentially exculpatory evidence and overlooking any evidence that tended to disprove Jane Roe's statements. Compl. ¶ 101 [#9]. Further, he asserts that the investigation was informed by internal and external pressures to aggressively handle and discipline allegations of sexual misconduct, pointing to national media attention regarding Harvard's handling of sexual misconduct matters in past year, and ongoing Department of Education investigations while Plaintiff's case was ongoing. Id. ¶¶ 44, 54-55 [#9]. The complaint also alleges that "[u]pon information and belief, Harvard was encouraged by federal officials to institute solutions to sexual violence against women that abrogate the civil rights of men." Id. ¶ 132. The difficulty for Plaintiff's Title IX claim, however, is that these allegations support a claim of bias against alleged perpetrators of sexual misconduct, but do not support a claim of bias based on gender. And as to the allegation that, on information and belief, federal officials encouraged Harvard to institute solutions to sexual violence that

"treat men differently than women," id., Plaintiff offers no examples of such "solutions" to support this conclusion. The complaint does not allege that similarly situated individuals, that is, individuals who are accused of sexual misconduct, are treated differently based on their gender and does not offer statements or other alleged actions by any Defendants showing discriminatory animus towards Plaintiff based on his gender, rather than his status as a person accused of sexual misconduct.

In the only other allegation in the complaint concerning gender, rather than accused status, Plaintiff asserts that Harrington accepted as fact Jane Roe's "assertion that Plaintiff took advantage of her while incapacitated, a wide spread narrative in sexual misconduct claims that is based in stereotypical gender norms." Compl. ¶ 99 [#9]. It is the FAS Policy, however, which deems conduct of a sexual nature unwelcome, regardless of the gender of the participants, "when a person is so impaired or incapacitated to be incapable of requesting or inviting the conduct, . . . provided that the Respondent knew or reasonably should have known of the person's impairment or incapacity." FAS Policy at 5 [#29-1].

"[A]llegations of a procedurally or otherwise flawed proceeding that has led to an adverse and erroneous outcome combined with a conclusory allegation of gender discrimination is not sufficient to survive a motion to dismiss." Yusuf, 35 F.3d at 715. Plaintiff's allegations of gender discrimination here are insufficient to state a claim under Title IX. Therefore, Claim 1 must be dismissed.

B. Claim 2 – Denial of Due Process in Violation of the Fourteenth Amendment (42 U.S.C. § 1983)

Plaintiff's next claim is brought against Harvard and Harrington, alleging that Defendants' adjudication of the sexual misconduct claim and imposition of discipline violated

Plaintiff's due process rights under the Fourteenth Amendment. To proceed on a claimed constitutional violation pursuant to 42 U.S.C. § 1983, Plaintiff must allege facts showing Defendants were acting under "color of state law." West v. Atkins, 487 U.S. 42, 45-46 (1988). For Defendants to have acted under color of state law, their "actions must be 'fairly attributable to the State.'" Estades-Negroni v. CPC Hosp. San Juan Capestrano, 412 F.3d 1, 4 (1st Cir. 2005) (quoting Lugar v. Edmondson Oil Co., 457 U.S. 922, 937 (1982)).

Plaintiff points to Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n, 531 U.S. 288, 296-97 (2001), for a review of the various circumstances in which an ostensibly private actor has been treated as a state actor, including: where the challenged activity "results from the State's exercise of 'coercive power,'" or when the "State provides 'significant encouragement, either overt or covert,'" id. at 296, (quoting Blum v. Yaretsky, 457 U.S. 991, 1004 (1982)); when a private actor operates as a "willful participant in joint activity with the State or its agents," id. (quoting Lugar, 457 U.S. at 941); when a private actor is controlled by an "agency of the State," id. (quoting Pennsylvania v. Bd. of Dirs. of City Trusts of Phila., 353 U.S. 230 (1957)); when the private entity has been delegated a public function by the state, id. (citing West, 487 U.S. at 56); and when the challenged activity is "'entwined with governmental policies,' or when the government is 'entwined in [its] management or control.'" Id. at 297 (quoting Evans v. Newton, 382 U.S. 296, 299, 301 (1966)) (alteration in the original). But Plaintiff's factual allegations of such coercion, control or delegation amount to no more than that Harvard sought to comply through its internal investigation and disciplinary processes with the Title IX investigative and adjudicatory process set forth in the Dear Colleague Letter and subsequent federal directives. Compl. ¶¶ 135-141 (pgs. 30-31) [#9].

Plaintiff's assertions that, by implementing its own private disciplinary procedure, Harvard has taken on a public function of the state has no legal support. As an initial matter, the mere acceptance of governmental funds does not transform private actors into state actors. Rendell-Baker v. Kohn, 457 U.S. 830, 840 (1982); Krohn v. Harvard Law Sch., 552 F.2d 21, 24 (1st Cir. 1977). As a corollary, Harvard's decision to implement the recommendations of the Dear Colleague Letter to avoid losing funds does not transform Harvard into a state actor either. Kraemer v. Heckler, on which Plaintiff relies, is not to the contrary. 737 F.2d 214, 220-21 (2d Cir. 1984). There, the Secretary of Health and Human Services' Health Care Financing Administration directed fiscal intermediaries to accept the decisions of the utilization review committee at issue when terminating Medicare benefits unless there was a clear deficiency in the committee's decision or the committee failed to follow procedures prescribed in the law and regulations. Id. The utilization review committee and its members were required to act in accordance with statutes, regulations, as well as with guidelines set by the Secretary. Id.; see also Catanzano by Catanzano v. Dowling, 60 F.3d 113, 118-19 (2d Cir. 1995) (finding that determinations by certified home health agencies licensed and regulated by state amounted to state action where state paid for covered services, regulated activities, issued mandatory directives, delegated functions to agencies, and created legal framework governing activity). In contrast here, while Harvard may have found it to be in its own interest to implement the Dear Colleague Letter procedures, it was not required to do so, and its investigation and discipline decisions were not adopted by the federal government.

Courts have repeatedly held that private universities disciplining students or employees for policy violations are not exercising a public function. See e.g., Klunder v. Brown Univ., 778

F.3d 24, 32-33 (1st Cir. 2015); Logiodice v. Trs. of Maine Cent. Inst., 296 F.3d 22, 28 (1st Cir. 2002); Tynecki v. Tufts Univ. Sch. of Dental Med., 875 F. Supp. 26, 32 (D. Mass. 1994). Not surprisingly, the many courts to have considered whether the Dear Colleague Letter and resultant changes of university procedures transformed the schools into state actors have rejected that argument. See, e.g., Doe v. Washington Univ., 2020 WL 353587, at *6-7 (E.D. Mo. Jan. 21, 2020); Doe v. Univ. of Denver, 2019 WL 3943858, at *10-11 (D. Colo. Aug. 20, 2019); Doe v. Univ. of Denver, 2018 WL 1304530, at *5-8 (D. Colo. Mar. 13, 2018); Doe v. Washington & Lee Univ., 2015 WL 4647996, at *9 (W.D. Va. Aug. 5, 2015). In Doe v. Case W. Reserve Univ., the court collected cases that showed that "the courts that have considered this issue agree that private colleges are not state actors by virtue of their adoption of Title IX grievance procedures." 2017 WL 3840418, at *10 (N.D. Ohio Sept. 1, 2017).

        In Washington & Lee Univ., for example, the court agreed that it was plausible that the university was under pressure from the Department of Education to discipline students accused of sexual assault in order to demonstrate compliance with the Dear Colleague Letter, but nonetheless dismissed the plaintiff's § 1983 claim as the plaintiff failed to allege that the government participated in the decision-making process at any stage of the proceedings or deprived the university of its autonomy to investigate the plaintiff. 2015 WL 4647996, at *9. Similarly, in Doe v. Univ. of Denver, the plaintiff alleged the university became entwined with the federal government who had "coerced it into adopting punitive Title IX policies and procedures under threat of legal action and the loss of federal funding." 2018 WL 1304530, at *5. The court held that Title IX, even with guidance through the Dear Colleague Letter, did not require the university to engage in the specific conduct – an allegedly improper disciplinary

process – of which the plaintiff complained. Id. at *6 (citing Heineke v. Santa Clara Univ., 2017 WL 6026248 (N.D. Cal. Dec. 5, 2017)). The court found "untenable" plaintiff's argument that "compliance with a facially valid and generally applicable regulatory scheme is sufficient to establish state action for purposes of the Fourteenth Amendment," and as a result, granted summary judgment on the claim. Id.

The court agrees with the reasoning from the many district courts who have considered this issue. Plaintiff asserts that Harvard's decision to hire a Title IX coordinator in 2013, its overhaul of its policies in 2014, and its actions to align its procedures with the Dear Colleague Letter plausibly show the government deprived Harvard of its autonomy to investigate and adjudicate sexual assault charges. But, as in similar cases, Plaintiff does not allege in a more than conclusory fashion that the mere adoption of Title IX procedures usurped Harvard's autonomy to discipline its own students. As Plaintiff alleges in other parts of his complaint, Harvard had flexibility even in light of the Dear Colleague Letter to formulate its FAS Policy, hire staff, establish investigatory structures, and carry out investigations of alleged sexual misconduct. See, e.g., Compl. ¶ 51 [#9] (quoting professors' Op-Ed calling on university to "withdraw [the FAS Policy and] carefully think[] through what substantive and procedural rules would best balance the complex issues involved in addressing sexual conduct and misconduct in our community."); id. ¶ 55 (noting Department of Education initiated two investigations into Harvard's disciplinary practices after 2014 overhaul).

In sum, Plaintiff has not met his burden to plausibly plead that Harvard, or Harrington, were transformed into state actors for the purposes of § 1983.

Accordingly, Claim 2 is dismissed.

C.  Claim 3 – Breach of Contract

Claim 3 asserts a breach of contract claim against Harvard.

As Harvard is a private university, the relationship between the student and the university is based on state contract law. Cloud v. Trs. of Boston Univ., 720 F.2d 721, 724 (1st Cir. 1983). In considering whether the contract was breached, courts look to see if a university has failed to meet the standard of reasonable expectations, Doe v. Trs. of Boston Coll., 942 F.3d 527, 533 (1st Cir. 2019), measured by what meaning the university should reasonably expect the other party to have given terms in its contract. Schaer v. Brandeis Univ., 432 Mass. 474, 478 (2000) (citing Cloud, 720 F.2d at 724). Under Massachusetts law, universities have "flexibility to adopt diverse approaches to student discipline matters that do not meet federal due process requirements," Trs. of Boston Coll., 942 F.3d at 535, but still must meet the expectations that arise out of the terms of the contract. Id. at 533. In addition, universities still must meet a standard of basic fairness for its contractual dealings with students and may not "arbitrarily or capriciously dismiss a student." Coveney v. President & Trs. of Coll. of Holy Cross, 388 Mass. 16, 19 (1983).

The relevant contract between Plaintiff and Harvard is the FAS Policy, which was in effect both when Plaintiff matriculated at Harvard and when the alleged incident occurred. Compl. ¶¶ 25-26, 43 [#9]. Plaintiff claims that Harvard breached the Policy by failing to meet the standard of reasonable expectation in two ways: 1) Harvard's decision to deny informal resolution to the complaint after Plaintiff and Jane Roe requested such informal resolution; and 2) Harvard's denial of an opportunity to meaningfully respond to information obtained during the disciplinary investigation process. Id. ¶¶ 148-156 (pgs. 35-36).

Plaintiff's first alleged breach of contract is not adequately pleaded. He states that he had

a reasonable expectation that, based on his request and Jane Roe's request for informal resolution, the matter would be resolved in that fashion. Id. ¶¶ 149-151. However, on the face of the FAS Policy, Plaintiff could not have had a reasonable expectation that informal resolution would be allowed by the university simply because both Plaintiff and Jane Roe asked for it. The FAS Policy, as quoted by Plaintiff in his complaint, stated that informal resolution was only permissible with "agreement of the Complainant and the Respondent and the approval of the Title IX Officer in consultation with the FAS Title IX Coordinator for Faculty and the Title IX Coordinator for the School or unit with which the Complainant is affiliated." Id. ¶ 31 (quoting the FAS Policy at 18) (emphasis added). Thus, Plaintiff knew based on the language of the policy that he did not have a right to informal resolution merely because he asked for it.

However, Plaintiff's second alleged breach of contract is adequately pleaded. The FAS Policy states that, "[a]fter the collection of additional information is complete but prior to the conclusion of the investigation, the Investigator will request individual follow-up interviews with the Complainant and the Respondent to give each the opportunity to respond to the additional information." Id. ¶ 152; FAS Policy at 16 [#29-1]. Plaintiff alleges that he was not asked for a follow-up interview prior to the conclusion of the investigation, and was not given an opportunity to meaningfully respond to information obtained during the investigation. Compl. ¶ 153 [#9].

The chronology of the investigation, as alleged by Plaintiff, provides support for his claim. Plaintiff was first asked for an interview in the summer of 2017, when he was out of the

country. Id. ¶ 75. He was interviewed telephonically on August 16, 2017. Id. ¶ 76.[5] Plaintiff

received a copy of a draft of ODR's investigatory report on September 25, 2017. Id. ¶ 82. In

between the first interview and the issuance of the draft ODR report over a month later, Plaintiff

was not contacted for a second interview. Id. ¶ 153 (pg. 36). Plaintiff contends further that he

was not provided an opportunity to respond to a statement made by Jane Roe on October 17,

2017, before the Final Report was issued. Id. ¶ 89.

It is unclear whether Plaintiff's one interview came after "the collection of additional

information [was] complete" and before the "conclusion of the investigation." FAS Policy at 16

[#29-1]. Yet it is plausible that, as Plaintiff alleges, he had a reasonable expectation arising out of

the language of the FAS Policy that he would be afforded a follow-up interview between his first

interview and the conclusion of the investigation, and otherwise would have an opportunity to

respond to additional information gathered in the investigation. Compl. ¶¶ 152-53 (pg. 36) [#9].

Thus, there is sufficient allegation that Harvard failed to meet Plaintiff's standard of reasonable

expectations and, accordingly, Plaintiff's claim for breach of contract shall not be dismissed.

D.  Claim 4 – Breach of Covenant of Good Faith and Fair Dealing

A covenant of good faith and fair dealing is implied in every contract and a university has

an obligation to adhere to this covenant when dealing with its students. Doe v. Trs. of Boston

Coll., 892 F.3d 67, 87 (1st Cir. 2018); Doe v. W. New England Univ., 228 F. Supp. 3d 154, 180-

81 (D. Mass. 2017). A breach of the implied covenant occurs, similar to a breach of the contract

---

[5] Harvard seeks to use facts set forth in the Final Report to rebut this allegation. As previously discussed, on a motion to dismiss, the court accepts the allegations in the complaint as true, and the court does not accept contrary facts as true even if contained in a report referenced in the complaint. While Harvard may dispute Plaintiff's version of the facts on summary judgment, even there, the unverified Final Report could not be offered for the truth of the matter asserted.

itself, when "one party violates the reasonable expectations of the other." W. New England Univ., 228 F. Supp. 3d at 181 (quoting Eigerman v. Putnam Invs., Inc., 450 Mass. 281, 288-89 (2007)). See also Doe v. Brown Univ., 166 F. Supp. 3d 177, 196 (D.R.I. 2016) ("Because Doe's Complaint states a plausible claim for breach of contract . . . the Court finds that he similarly states a claim that this conduct violated the covenant of good faith and fair dealing inherent in that contract.").

Since Plaintiff has pleaded adequately that Harvard failed to meet the standard of reasonable expectations as to the FAS Policy's statement on a follow-up interview, he also has pleaded adequately a breach of the covenant of good faith and fair dealing. Compl. ¶ 147 [#9]; see W. New England Univ., 228 F. Supp. 3d at 180-81 (finding that, as plaintiff reasonably expected university would conform to contract and it plausibly did not, plaintiff could also maintain claim for breach of implied covenant). Therefore, the court will not dismiss Claim 4.

E.   Claim 5 – Racial Discrimination in Violation of 42 U.S.C. § 1981

Claim Five alleges that Harvard and Harrington discriminated against Plaintiff on the basis of race, in violation of 42 U.S.C. § 1981, by denying his request and Jane Roe's request to resolve the complaint through an informal process. Plaintiff alleges that "[u]pon information and belief, informal resolution has been permitted by [Harvard] in other similar actions involving sexual misconduct where the parties were Caucasian." Compl. ¶ 173 [#9]. Plaintiff also alleges the stated reason for denying informal resolution of the complaint was "pretextual." Id. ¶ 107.

To maintain a claim under the statute, Plaintiff must allege that Harvard's actions were racially motivated and purposefully discriminatory acts. Yusuf, 35 F.3d at 714. There must be adequate pleading to support the nexus between the university's actions and racially

discriminatory motivations. <u>Goodman v. Bowdoin Coll.</u>, 380 F.3d 33, 43 (1st Cir. 2004).

The court in <u>Doe v. Amherst Coll.</u> faced a similar claim of racial discrimination under Section 1981, where the plaintiff asserted that, on information and belief, "only men of color have been punished with separation" by the college under its sexual misconduct policy and process and that, therefore, the plaintiff faced disproportionate punishment because of his race. 238 F. Supp. 3d 195, 219 (D. Mass. 2017). The court found that, even when taking plaintiff's statement as true, the plaintiff failed to allege that there were other students "who were found responsible for similar violations and received lesser punishment" because of their race. <u>Id.</u> at 224.

The allegations are distinguishable here. Plaintiff alleges that Caucasian students have been permitted by Harvard to resolve complaints of sexual misconduct informally and that Plaintiff's request to proceed informally was handled differently than requests by white students in similar situations. Compl. ¶¶ 173-174. These allegations, taken as true, meet the plausibility standard under <u>Iqbal</u>. Plaintiff has provided a comparator group – Caucasian students accused of similar sexual misconduct – coupled with the allegation that the comparator group was treated differently due to their race. At this stage of litigation, Plaintiff does not need to do more.

However, Plaintiff does not allege that Harrington was involved in the decision to deny his request to resolve the complaint informally. He states that Jane Roe submitted her request, on their behalf, for informal resolution to ODR and the request was denied by the Director of ODR, William McCants. <u>Id.</u> ¶ 80. When Plaintiff appealed, it was again rejected by McCants. <u>Id.</u> There are no allegations that Harrington was involved in these decisions. As a result, the claim is not adequately pleaded as to Harrington.

Accordingly, Claim 5 is dismissed as to Harrington, but Defendants' motion to dismiss Claim 5 is denied as to Harvard.

F.  Claim 6 - Negligence

To state a negligence claim under Massachusetts, law, a plaintiff must allege that 1) the defendant owed the plaintiff a duty of reasonable care; 2) the defendant breached that duty; 3) damage resulted; and 4) defendant's breach caused that damage. Saldivar v. Racine, 818 F.3d 14, 20-21 (1st Cir. 2016). In Trs. of Boston Coll., the court held that, as a matter of law, the duty of care between a student and his university is one created by contract. 892 F.3d at 93-94. Therefore, "[a]ny remedy for a breach of this contractual obligation" based on alleged failure to use due care in conducting the disciplinary process "must sound in contract, not in tort." Id. at 94. Without a duty of reasonable care, Plaintiff cannot maintain his claim against Harvard.

Similarly, if Harvard did not owe Plaintiff an independent duty of care beyond their contractual relationship, neither did its employee, Harrington. Id. at 95. As a result, Plaintiff cannot maintain his negligence claim against Harrington. Claim 6 must be dismissed.

IV.  Conclusion

Accordingly, for the aforementioned reasons, Defendants' Motion to Dismiss the Complaint [#27] is GRANTED as to Claim 1 (Title IX), Claim 2 (§ 1983), Claim 5 as it relates to Defendant Brigid Harrington (42 U.S.C. § 1981), and Claim 6 (Negligence), and is DENIED as to Claim 3 (Breach of Contract), Claim 4 (Breach of Covenant of Good Faith and Fair Dealing), and Claim 5 as it relates to Harvard (42 U.S.C. § 1981).

IT IS SO ORDERED.

May 28, 2020                                        /s/ Indira Talwani
                                                   United States District Judge